[Civil No. 3772. Filed November 22, 1937.]

[73 Pac. (2d) 707.]

RIO GRANDE OIL COMPANY, a Corporation, Appellant, v. O. O. PANKEY and J. T. PANKEY, Appellees.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Mr. Stanley Samuelson, Mr. Henderson Stockton and Mr. Emmett R. Feighner, for Appellees.

LOCKWOOD, J.— This is an appeal by Rio Grande Oil Company, a corporation, hereinafter called defendant, from a judgment in favor of O. O. Pankey and J. T. Pankey, hereinafter called plaintiffs, for damages resulting from the breach of a contract by defendant. Taking the evidence in the strongest manner in support of plaintiffs' theory of the case, as under our oft-repeated rule we must consider it, the ultimate facts necessary for a determination of the case may be stated as follows:

From 1922 to 1926 plaintiffs had been engaged in selling gasoline, oil, and automobile accessories, in the city of Tucson, and had built up and created a well-established business and a regular line of customers, both cash and credit. For some time the defendant had urged plaintiffs to construct a larger and better service station, and offered to finance them to a certain extent in such construction. Plaintiffs accepted the offer and started construction of the new station in the month of February, 1926, completing it

about the first of June. In order that they might se-
cure funds for this purpose, defendant allowed plain-
tiffs to purchase gasoline and oil from it on credit,
and use the proceeds of the resale of such supplies
by plaintiffs to complete the station rather than apply-
ing the money so received in payment for the gaso-
line and oil which they had purchased. About the
4th of November, 1926, plaintiffs and defendant took
an account of their situation, and the former executed
in favor of the latter a promissory note in the sum of
$9,160, which was to be paid at the rate of $250 per
month, secured by a chattel mortgage covering all the
buildings and equipment of the new station, and in
such mortgage it was agreed that thereafter plaintiffs
would sell only the gasoline produced by defendant,
thus transferring their indebtedness for supplies al-
ready purchased into a long time promissory note se-
cured by a mortgage. At the same time, and as a
part of the transaction, plaintiffs and defendant en-
tered into the agreement upon which this action is
predicated. It recited the making and execution of
the note and mortgage aforesaid, and then continued:

"Whereas, the parties hereto have agreed that under
certain conditions a line of credit will be extended to
the Second Parties by the First Party;

"It is therefore understood and agreed that when
the said Second Parties shall have paid upon the prin-
cipal of said promissory note an amount sufficient to
reduce the principal of said note to the sum of Three
Thousand and 00/100 ($3,000.00) Dollars, then and in
that event the Second Parties shall be entitled to a
line of credit to the extent of the value of petroleum
products at that time purchased each month by the
Second Parties from the First Party, and it is further
understood and agreed that the Second Parties shall,
at that time, pay an amount in cash equal to said
monthly purchases which amount shall be applied
upon the principal of said note rather than upon the
open account of said Second Parties, and that there-

after the Second Parties shall be entitled to the advantage of what is commonly termed 'a current open account.' "

In pursuance of the conditions of the note, mortgage, and agreement, the plaintiffs made payments on the notes so that by the 30th of April, 1929, the principal had been reduced to less than $3,000, and during all this time thay purchased for resale only gasoline produced by defendant, paying cash therefor. When the note had been reduced as aforesaid, plaintiffs demanded from defendant many times that it extend to them credit on the purchase of gasoline and oil products in accordance with the terms of the agreement. This, however, defendant wholly failed and refused to do, and required plaintiffs to pay cash on delivery for all gasoline and oil furnished them. Plaintiffs, in addition to their cash business, had a large number of customers to whom they extended credit of from thirty days up, and from whose accounts they claimed they had been making a considerable profit. In order to pay the note down to the $3,000 aforesaid, plaintiffs had not only turned in all of the profits made from their gasoline and oil business, but had reduced their stock of automobile accessories to practically nothing, and exhausted their credit in the community, relying upon defendant's promise that, when the note was so reduced, they would then have credit in the purchase of gasoline and oil extended to them, in accordance with the agreement, so that they might continue carrying their credit customers as aforesaid. As a result of defendant's refusal to extend credit, in accordance with the terms of the agreement, plaintiffs were compelled to discontinue the large majority of their credit customers, and thus lost a profit from them which they otherwise would have made. This situation continued for nearly four years, when plaintiffs were finally compelled to go out of business.

Thereafter this suit was brought to recover damages for the breach of the contract aforesaid, and the jury returned a verdict in favor of plaintiffs for the sum of $12,000, the full amount prayed for.

There are some ten assignments of error, which defendant has grouped under four propositions of law, and we shall consider them in the same manner. The first is that, since the legal effect of a contract is always a question of law for the court, the latter should have instructed the jury as to the meaning of the contract sued on. It is, of course, the law that the legal effect of a contract is a question of law for the court, and not for the jury, and, if requested, it was the duty of the court to instruct the jury as to the meaning of the contract under consideration. It appears, however, from the record in this case that the only request made on this point was that the following instruction be given:

"Defendant's requested instruction No. 5: You are instructed that the agreement set forth in plaintiff's complaint provides that after the principal of the $9,160.83 note has been reduced to $3,000.00 that then in that event the plaintiffs would be entitled to a line of credit to the extent of the value of petroleum products at that time purchased each month by (from) defendant and provides further that the plaintiff shall at that time pay an amount in cash equal to said monthly purchases which amount so paid shall be applied upon the principal of said note and that thereafter the plaintiffs shall be entitled to the advantage of what is commonly termed 'a current open account.' Under the provisions of this agreement plaintiffs would not be entitled to the advantage of the 'current open account' until such time as the note of $9,160.83 had been fully paid."

It will be seen that the instruction quotes almost the exact language of the contract from the words "then in that event" down to "current open account," and then states that the plaintiffs would not be entitled to

the advantage of the current open account until such time as the note in question was fully paid. This instruction was, of course, a correct exposition of the law so far as the last sentence is concerned, but we think that, although it followed the language of the contract otherwise, it failed completely to make clear or intelligible the most important part of the agreement, and, had the instruction been given without qualification, the jury would have been misled thereby. As we construe it, the situation was as follows: Just before the time the contract was entered into, plaintiffs were the owners of a valuable service station, clear from lien, but at the same time owed defendant something over $9,000 on a merchandise account covering a period of several months. This open account was converted into the promissory note referred to, which was secured by a mortgage under whose terms plaintiffs were required to reduce the note by the sum of $250 per month. During this period of reduction, defendant was under no obligation to extend any further credit to plaintiffs, and, as a matter of fact, did not do so, the plaintiffs making their payments upon the note as called for by its terms, and paying cash for all of defendant's products which they purchased. When the note was reduced to the sum of $3,000, the agreement provided for a different arrangement. Defendant was required to allow plaintiffs to purchase such supplies as they needed on credit for thirty days. At the end of that period plaintiffs were to pay to defendant the full price for the products purchased during the preceding month, but this payment was not to be applied on such purchase price but on the principal of the note. This monthly arrangement was to be continued until the note in question was fully paid. When this was done, it would leave plaintiffs with their property clear from mortgage and the interest-bearing note satisfied, but with an indebtedness for

merchandise which would amount to the $3,000 that had been paid off on the note as aforesaid. The interest-bearing, secured note would thus be transferred into an open merchandise account of the same amount which did not bear interest. From that time on, all future purchases of supplies were to be made on what is known as a "current open account." In other words, the plaintiffs would buy what supplies they needed during the current month on credit, and on the first of the next month would pay for the previous month's business in cash. The ultimate effect of the agreement was that the defendant, in return for plaintiffs' promise to use its gasoline exclusively in their business, would have invested in such business the sum of $3,000, on which plaintiffs were required to pay no interest. It may be urged that such a construction of the contract is unreasonable, for prudent men would hardly invest $3,000 in another man's business with no return therefor. This overlooks the true consideration for the investment, which was the exclusive handling of defendant's gasoline. The record shows that plaintiffs were retailing between one hundred forty and one hundred fifty thousand gallons of gasoline per annum at the time the agreement was made. The profit to defendant from the sale of its gasoline does not expressly appear in the record, but, since it does appear that resale at the rate fixed by defendant allowed plaintiffs a profit of three cents per gallon, we think it is reasonable to presume that defendant did not make less than one cent per gallon on its sales to plaintiffs. Assuming that money was worth 10 per cent. in Tucson at the time of the transaction (the maximum rate of interest permitted by law), defendant through its investment of $3,000 lost $300 per year interest but, by its exclusive contract for the sale of its gasoline, made between $1400 and $1500 per year. We think when these factors are considered

that it can hardly be said a prudent man would not be willing to lose $300 interest in exchange for a profit of $1500, with the knowledge that, at any time the plaintiffs ceased the exclusive sale of defendant's gasoline, the $3,000, of course, would be a matured debt and repayable on demand. Since this was, in our opinion, the true meaning of the contract, and as under the evidence the defendant never extended the first month's credit which, by the terms of the agreement, it was required to do when the note was reduced to $3,000 in amount, it was unnecessary for the jury to consider what would have happened had this credit been extended and the payments made by plaintiffs, so that the open account provision of the contract would have gone into effect. In other words, since through the fault of the defendant the third phase of the contract was never reached, it probably made no difference as to whether the court instructed the jury on that phase or not. It is, of course, true that the court should have clarified to the jury the second phase of the contract, which was the real matter in issue. This, however, it was not asked to do by either party, and, when its instructions were finished, counsel were asked whether they desired any further instructions. Counsel for plaintiffs said he did not, while, according to the record, counsel for defendant remained silent. This, we think, under our rule, is a waiver of failure to give further instructions. Uniform Rules, Superior Courts, rule V, subd. 4; *Kinman* v. *Grousky,* 46 Ariz. 191, 49 Pac. (2d) 624.

The next two propositions of law, in substance, are that special damages, such as lost anticipated profits on resale, are not recoverable in an action for the failure to deliver goods on credit where no such damages were contemplated by the parties at the time the contract was made, the true measure being either interest on the value of the goods or the

difference between their contract and market price. This is a correct statement of the general rule of law. 24 R. C. L. 78, and cases cited. It is based on the familiar principle that it is the duty of the party injured by a breach of contract to minimize the damages as much as he reasonably can, and that, by borrowing the money necessary to purchase the goods in question for cash, he may limit the damage actually sustained to the interest on the money borrowed, or, if a purchase on the open market must be made at a higher price than that stipulated by the contract, there may also be included the difference between the contract and the market price. There are circumstances, however, where this rule would be an injustice. For example, the credit of the purchaser may be such that he is not able to borrow the money necessary to purchase for cash, or the goods in question may be monopolistic in their nature so that he cannot obtain them from anyone except the other party to the contract. If, therefore, it appears that the purchaser was unable to secure the goods in any other reasonable manner than that stipulated in the contract, it is very generally held that anticipated profits on a resale may be recovered. *Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108, 291 Pac. 184, 188. In that case the court said:

"Because of its unjustified act in refusing to advance the money which defendant had obligated itself to do, plaintiffs were in no position to acquire the necessary funds, for they were at the end of their financial resources. No question is here raised as to the amount of damage plaintiffs suffered. They sued for the sum of $20,000, and the evidence shows that the crop, if planted, would have netted at least that amount. Under these circumstances it was clearly within the contemplation of the parties that profits would be derived from the venture which could only be acquired from a fulfillment of defendant's obligation. The loss of the prospective profits was the natural and direct consequence of the breach, plaintiffs being in no financial

position to borrow elsewhere, they having been stripped of all control of their property by defendant bank to secure it for the very advances it had obligated itself to furnish. The rule of damages in such a case is clearly lost profits, and does not involve the ordinary case of breach of contract to lend money. [Citing cases.]''

▮ In the present case the evidence shows clearly, and the trial amendment to the complaint set up, that plaintiffs were unable to borrow money anywhere so that they might purchase the necessary gasoline for cash. Nor could they, without a breach of their contract, go to anyone else to secure a different gasoline, for they had agreed to use defendant's product exclusively.

We think that the case falls within the exception to the rule above stated, and that the proper measure of damages would be the loss of profits which are established by the evidence with reasonable definiteness as due to the failure of defendant to comply with its contract. The particular profits which it is alleged in the complaint were lost were the profits which had been, in the past, derived from the sale of gasoline on credit by plaintiffs to various of their customers, whose accounts it is claimed they were compelled to cut off by reason of their inability to secure sufficient gasoline on credit, in accordance with the terms of the contract with defendant.

▮ The last proposition of law is that, where it appears from the record that damages have been awarded which are grossly in excess of the amount shown to have been sustained by any reasonble theory of the evidence, it will be presumed that the verdict of the jury was actuated by passion and prejudice, and a new trial will be granted. The proposition of law as just stated is undoubtedly correct. *Spain* v. *Griffith*, 42 Ariz. 304, 25 Pac. (2d) 551. The real question is whether the record does show such a state of

facts. On the most liberal theory of the law, the only damages to which plaintiffs would be entitled, under the agreement and the pleadings, are profits which they lost by reason of their inability to secure gasoline to supply their existing credit customers. Let us see what the evidence shows in that respect. Plaintiffs testified, generally speaking, that they lost credit accounts, which, if continued, would have given them a profit of $250 per month, by reason of their inability to secure gasoline to supply these customers. Were there nothing more in the record, it might be said that it would reasonably sustain a verdict for damages to the extent of $12,000 in a period of four years. But plaintiffs also showed by their own evidence the gross amount of gasoline which they sold from the 1st of January, 1926, to the 31st of December, 1932. They stipulated that their gross profit per gallon on gasoline sold averaged three cents during the entire period in question. During the years 1927, 1928, and the first four months of 1929, the plaintiffs paid cash for all of their supplies purchased from defendant, and, so far as the record shows, lost no credit customers because they were unable to get sufficient gasoline. Taking the highest monthly average ever reached while this condition existed, they sold a little over 13,000 gallons per month. On the 1st of May, 1929, they were entitled to purchase gasoline on credit, and it is after that date it is alleged they were compelled to discontinue their credit customers and their sales were decreased because they could not purchase gasoline on credit from that time on. Assuming, for the sake of argument that every gallon of decrease in their sales of gasoline from that time on was caused by the necessity of discontinuing their credit accounts, and was attributable solely to the conduct of defendant, and that they are entitled to damages at the rate of three cents per gallon for all of such decrease over the entire period be-

tween May 1, 1929, and the time when they closed their business, and also assuming, as a basis for computation, that the highest figure ever reached by them in sales could have been maintained had they been able to get gasoline on credit, a simple mathematical computation shows that the total loss to plaintiffs by shrinkage of gasoline sales during the entire period of four years is less than one-fourth the amount of damages awarded by the jury.

We think that a verdict which could be sustained only by the broad general statement of plaintiffs as to their loss, a statement conclusively disproved by plaintiffs' own records, offered in evidence by them, could not have been based upon a reasonable consideration of the evidence, and it, therefore, must have been actuated by passion and prejudice.

For the above reasons, it is necessary that the judgment be reversed, and the case remanded to the superior court of Pima county for a new trial in accordance with the views expressed herein.

McALISTER, C. J., and ROSS, J., concur.