**Norman R. JOHNSON and Louise C. Johnson, et al.,**
**Plaintiffs-Appellees/Cross-Appellants,**

v.

**PACIFIC LIGHTING LAND COMPANY,**
**Defendant-Appellant/Cross-Appellee.**

Nos. 84–2834, 85–1600.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 3, 1985.

Decided May 18, 1987.

Andrew M. Federhar and Kenneth Allen, Tucson, Ariz., and Don B. Engler, Yuma, Ariz., for plaintiffs-appellees/cross-appellants.

John J. Swenson and Judith H. Pearce, Los Angeles, Cal., and John H. Westover and Stephen E. Richman, Phoenix, Ariz., for defendant-appellant/cross-appellee.

Before BROWNING, SNEED and HUG, Circuit Judges.

HUG, Circuit Judge:

This is a class action by a group of citrus fruit growers against a commercial packing house that picked, hauled, packaged, and shipped the fruit to market. The action is based on three theories: (1) breach of contract; (2) violation of state antitrust laws; and (3) violation of the federal Perishable Agricultural Commodities Act ("PACA"). The case was filed in state court and removed to federal court under 28 U.S.C. § 1331 (1982) based on the claim under the federal statute. The remaining two claims are pendent state claims. The jury rendered a verdict awarding damages of $3,900,000 on the breach of contract claim and $440,000 on the antitrust claim. The jury also found the defendant liable on the PACA claim, but awarded no damages. The defendant's motion for a judgment not withstanding the verdict or, in the alternative, for a new trial, was denied. Defendant appeals from judgment on the verdict of $4,340,000 and the denial of the motion. The plaintiffs appeal the denial of their motion for attorneys' fees to be assessed against the defendant.

Defendant, Pacific Lighting Land Company, is a holding company that owned Yuma Citrus Company ("YCC"), a commercial packing house, during 1973–1978, the years at issue in this case. The plaintiffs were certified to represent a group of 240 citrus fruit growers in the Yuma, Arizona area that had contracted with YCC to pick, haul, pack, and ship their fruit to market during any of those years.

The issues raised on YCC's appeal are:

(1) Whether the district court should have directed a verdict for YCC on the state antitrust claim;

(2) Whether the district court properly instructed the jury on the measure of damages on the contract claim;

(3) Whether the district court should have directed a verdict for YCC on the question of the plaintiffs' entitlement to rebates from a supplier of packing materials;

(4) Whether it was error to admit hearsay statements from a former manager of YCC; and

(5) Whether the district court properly excluded certain evidence of trade standards and commercial practice.

We reverse and remand for a new trial. Therefore, we do not reach plaintiffs' cross-appeal of the order denying attorneys' fees.

## I.

## FACTS

In order to understand the issues presented on this appeal, it is necessary to understand the nature of the "Sunkist System," of which the plaintiff class of growers were members. Sunkist Growers, Inc. ("Sunkist") is a nonprofit cooperative marketing association. It is the central marketing agent for the fruit growers and it operates a federated system with local associations and district exchanges, which is designated the "Sunkist System" and utilizes the "Sunkist" trademark.

The local associations of growers in some instances operate cooperative packing houses. In other instances, the growers contract individually with commercial packing houses licensed by Sunkist. The growers represented by the plaintiffs in this case were all growers that contracted with YCC to perform the packing house functions. YCC was licensed as a commercial packing house by Sunkist and operated as a profit-making entity. YCC executed a written license agreement with Sunkist, agreeing to operate for the growers and the Sunkist System. YCC subsequently entered into written contracts with the growers. During the 1973–74 and the 1974–75 seasons, YCC utilized a form contract entitled "Contract to Handle Fruit." During the 1975–76, 1976–77, and 1977–78 seasons, a form contract entitled "Agency Agreement" was utilized. These two contracts, though similar, varied in some respects. These three documents—the license and the two contracts with the grow-

ers—are the contracts that YCC allegedly breached.

In support of the antitrust claim, the plaintiffs alleged that YCC conspired with other packing houses in the Yuma area to limit the quantity of lemons harvested and shipped in order to enhance the market price for lemons. The plaintiffs contend that the market price had fallen when the lemons eventually were sold, causing the growers to lose $440,000.

Plaintiffs also contended that YCC wrongfully retained rebates it received from Fruit Growers Supply ("FGS") for packing materials purchased and utilized by YCC in packing and shipping the growers' fruit. FGS is a cooperative, the members of which are local associations that operate packing houses and commercial packing houses licensed by the Sunkist System. FGS sells packing materials, such as crates and cardboard cartons, to packing houses on a nonprofit basis. Assessments are paid by the members to FGS and rebates are made to the packing houses by FGS after its costs are determined. The plaintiffs contended that they were entitled to the rebates because these were intended for the benefit of the growers.

## II.

### THE ANTITRUST CLAIM

The growers contended, and the jury found, that YCC had violated the Arizona antitrust statute, Ariz.Rev.Stat.Ann. §§ 44–1401 to—1415 (1967 & Supp.1986), by conspiring to withhold the growers' fruit from market. YCC argues that the trial judge should have directed a verdict in its favor because, *inter alia*, the growers did not demonstrate any anticompetitive effect or injury and thus failed to state a claim under the Arizona statute. The following facts were brought out at trial.

Because the supply of fruit usually exceeds the demand, fruit is normally marketed under a federal "pro-rate" system, which allows each grower to ship only a certain percentage of his fruit. However, in 1975, a poor harvest, especially of California crops, was predicted and this limitation was lifted, thus allowing each grower to market all of his fruit. The growers claimed that several packing houses, including YCC, agreed to hold back a portion of the fruit available for market in order to maintain a higher price. The growers contended that when the California crop proved to be much larger than expected and prices dropped sharply, the growers' fruit that had not been marketed was sold at a lower price and they suffered a $440,-000 loss.

Under section 44–1402 of the Arizona statute, "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." Further, section 44–1412 states that "in construing this [statute], the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." We review the interpretation of the Arizona statute *de novo*. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). We have found no Arizona cases which address the question of antitrust injury posed here; therefore, we refer to federal court decisions in our analysis. *See Three Phoenix Co. v. Pace Industries, Inc.*, 135 Ariz. 113, 659 P.2d 1258, 1260 (1983) (United States Supreme Court Sherman Act decisions used to construe Arizona antitrust statute).

In effect, YCC argues that, although the growers may have suffered a $440,000 loss on their crops, this injury is not " 'the type that the statute was intended to forestall.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88, 97 S.Ct. 690, 696–97, 50 L.Ed.2d 701 (1977) (quoting *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967)). *See also Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 481–83, 102 S.Ct. 2540, 2549–50, 73 L.Ed.2d 149 (1982); *Exhibitors' Service, Inc. v. American Multi-Cinema, Inc.*, 788 F.2d 574, 578 (9th

Cir.1986); *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445, 449 (9th Cir.), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969)) (emphasis in original); *Blue Shield,* 457 U.S. at 482, 102 S.Ct. at 2550.

▪ Here, the growers' loss did not stem from anticompetitive actions. If the alleged conspiracy had been successful, the growers would have *benefitted* from the artificially higher prices for their fruit.[1] The growers sought damages for the profits they would have realized had competition been *reduced.* This is not the type of injury that the statute was intended to forestall. *Blue Shield,* 457 U.S. at 482, 102 S.Ct. at 2550; *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697; *Aurora Enterprises, Inc. v. National Broadcasting Co.,* 688 F.2d 689, 692–93 (9th Cir.1982). Thus, we hold as a matter of law that the growers, by failing to demonstrate antitrust injury, failed to state a claim under the Arizona antitrust statute and that the trial court should have directed a verdict for YCC on this issue.

It is possible that the failure to ship the fruit to market at an earlier time could have amounted to a breach of contract by YCC. However, the claim was not submitted to the jury on that basis. A separate verdict form was submitted to the jury and the $440,000 was awarded because of an antitrust violation.

## III.

## BREACH OF CONTRACT

Plaintiffs base their contract claim on three documents: (1) YCC's license agreement with Sunkist; (2) YCC's form contract with the growers for the 1973–74 and 1974–75 seasons; and (3) YCC's form contract with the growers for the 1975–76, 1976–77, and 1977–78 seasons.

The license agreement provided that YCC "shall have an agreement with Growers ... for whom it provides services under [the license] agreement which shall obligate [YCC] to return to such Growers the net proceeds from the marketing of said Growers' fruit by Sunkist ..., after deduction of [YCC's] costs and agreed reasonable charges."

Both of the form contracts with the growers provided that YCC would charge the growers "the current commercial charge" for its services.[2] Either contract could be terminated at the close of any season. Thus, the license requirement that YCC charge the growers its "costs plus agreed reasonable charges" was translated in both of the contracts with the growers as the "current commercial charge" for YCC's services. The reasonableness of the entire charge, both costs and profits, was left to be determined by competitive market conditions. At that time, there were several other competing packing houses with which these growers could have contracted, and the growers were free to change packing houses from season to season.

▪ It is the two forms of agreement between YCC and the growers that are the real contracts in issue, not the license

---

**1.** It is the fruit buyers and ultimately the consumers who would have suffered the antitrust injury in this case.

**2.** The contract for the first two years provided that YCC harvest and deliver the fruit to the packing house at its cost if the grower desired the service. In the contract for the last three years, the charges for these services were also to be at the "current commercial charge." As a practical matter, this made no difference, since these harvesting and hauling services were performed by a subcontractor, and these subcontractor charges were passed on to the growers.

agreement with Sunkist. The license agreement provided the nature of the contract that YCC was to reach with the growers. If Sunkist contended there was a variance, it could have insisted on modification. The license agreement provided that the "Packer (YCC) shall, upon request, furnish to Sunkist or District Exchange a written copy or statement of the substantial terms of its agreement with the Growers for whom it packs fruit pursuant to this license." There is no indication in the record whether this occurred. It is clear that had the growers believed their agreement with YCC did not conform to the license requirements, they could have protested through their representatives in the Sunkist System or insisted on a different contract with YCC. The remedy under the license agreement, if the growers' contracts did not fulfill its requirements, was to compel YCC to enter into a contract with a different formulation of charges. Absent such a protest, the contracts between YCC and the growers must be considered to be a permissible interpretation of the license requirement, particularly since the parties operated under these contracts for five years. Thus it is not the license, but the contracts actually executed between the growers and YCC, that are determinative of the rights of the parties in this law suit.

There were two distinct alternative types of relief sought by the plaintiffs for breach of contract. The first was damages for losses to the entire class of growers due to alleged overcharges or the failure of YCC to pay amounts due to the growers. The alternative type of relief sought was to recover from YCC all of its profits for the five-year period. The theory of this latter requested relief is that YCC had completely failed to carry out its contractual fiduciary duties as an agent. Thus, the growers argued, YCC was entitled to no compensation for its services.

Although the jury was instructed on both measures of damages, the case was tried and argued to the jury almost entirely on the latter theory. The plaintiffs asked for an award of all of YCC's profits for the five years and it is clear that this was the basis of the jury's award.

Plaintiffs contended that there were numerous failings in YCC's performance, some of the major ones being:

1. The plan by which the fruit of the growers was pooled for marketing was defective, resulting in an unfair distribution of the proceeds among the growers. A mathematics professor testified that the method was statistically unsound. This, of course, would have resulted in a benefit to some growers and a detriment to others. It would not have benefited YCC or damaged the growers as a class.

2. The method of accounting and reporting to growers was deficient and not in accordance with the federal regulations under the PACA. A government auditor testified concerning the defects for the 1975–76 season. He did not find, however, that this had resulted in any underpayments to growers.

3. YCC allowed one or more growers to enter the pool late in the season one year, after some of their fruit had frozen, resulting in a lesser average price for the fruit and a consequent loss to the other growers in the pool.

4. Rebates from FGS to YCC for packing materials were not passed through to the growers as plaintiffs contended they should have been.

5. Contingency charges were not properly accounted for, resulting in overcharges to the growers.

There is no doubt that plaintiffs would be entitled to recover any damages that the class had suffered from such defects in performance. The question is whether the award could be based on all of YCC's profits for the entire five-year period, irrespective of the actual damage to the plaintiff class.

The plaintiffs' contention that the proper measure of damages is the forfeiture of all of the profits of YCC for the five-year period is based on the Arizona case of *Haymes v. Rogers,* 70 Ariz. 408, 222 P.2d 789 (1950). That case involved a real estate broker who sought to recover a real estate commission of $425 for his services in the sale of a piece of real property. The

seller defended on the ground that the broker had acted in bad faith in representing him because he had revealed to the buyer that he thought the seller would take $8,500 instead of his asking price of $9,500. The seller eventually sold the property for the $8,500 but refused to pay the commission. The Arizona Supreme Court stated:

[A] broker or salesman owes the utmost good faith to his principal as does any other person acting as agent or in a fiduciary capacity. If an agent betrays his principal, such misconduct and breach of duty results in the agent's losing his right to compensation for services to which he would otherwise be entitled.

*Id.* at 790. The court cited as authority Restatement of Agency, section 469. The plaintiffs note that it is well established law in Arizona that in the absence of case law to the contrary, the Restatement will be followed as the proper statement of law. *Green Acres Trust v. London*, 142 Ariz. 12, 688 P.2d 658, 669 (App.1983), *reversed on other grounds*, 141 Ariz. 609, 688 P.2d 617 (1984).

Section 469 of Restatement (Second) of Agency states:

An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

This provision of the Restatement (Second) of Agency is in Chapter 14, which deals with the duties and liabilities of the principal to the agent. This particular provision deals with a defense that a principal may assert when the agent is suing for compensation, as was the situation in *Haymes*. Other provisions of the Restatement (Second) of Agency in Chapter 13 deal with the duties and liabilities of the agent to the principal.

Section 400 of the Restatement (Second) of Agency states:

An agent who commits a breach of his contract with his principal is subject to liability to the principal in accordance with the principles stated in the Restatement of Contracts.

Comment (b) states:

b. *Damages.* In an action for a breach of contract, the agent is subject to liability for harm to the interests of the principal caused by the agent's failure to perform, and also for loss of profits which were reasonably to be anticipated and which would have been made had the promised service been performed.

YCC did perform valuable services for the growers over the five-year period. It harvested, hauled, packed, and shipped the fruit to market. It may have breached its contract in some respects as plaintiffs allege, in which case the plaintiff class is entitled to the damages it proves the breaches actually caused to the class. Furthermore, if the plaintiffs establish that YCC charged more than the contractual rate specified, the "current commercial charge," then the plaintiff class would be entitled to reimbursement for the charges that were in excess of the "current commercial charge."

If an agent makes a secret and unlawful profit, such as the situation in *Thomas v. Newcomb*, 26 Ariz. 47, 221 P. 226 (1923), when the agent told his principal that the cost of land was $2,560 more than it actually was and pocketed the $2,560, then he is required to pay that amount to his principal. It is clear that he must disgorge the entire secret profit, either under a theory of damages or as a constructive trustee for his principal.

An analogous situation occurred in *Edwards v. Hauff*, 140 Ariz. 373, 682 P.2d 1 (App.1984). In that case, an agent who had been engaged by the principal to manage its property and acquire other investment properties for it, secretly acquired property for himself. He used the principal's funds for a down payment and then substituted his own. He was held to be a constructive trustee of the property for the principal and was denied compensation for his services in acquiring the property. This is a case in which the agent was secretly deal-

ing for himself in complete disregard of his duty to his principal.

■ These cases are entirely different from the case at hand. Here, the growers contracted for services in packing and shipping fruit. YCC performed those services. The growers contend that they were charged more than the contract charge, that they were due certain rebates, and that the pooling, accounting, and reporting were poorly done. The class may be entitled to a refund of improper charges and the damages they may have suffered from defective performance, but not to a disgorgement of all profits for the entire five-year period.

The instructions to the jury that permitted the award of this measure of damages were in error. The proper measure of damages is the loss the class of growers suffered from any breach of contract by YCC. *See Rio Grande Oil Co. v. Pankey,* 50 Ariz. 529, 73 P.2d 707 (1937).

### IV.

### FGS REBATE

■ YCC contends that it was entitled to a directed verdict on the issue of whether the rebates it received from FGS for the purchase of packing supplies should have been passed through to the growers. The contractual arrangements clearly indicate that YCC, as the packing house, was to receive the rebates. This, of course, reduces the cost of the services provided by YCC. The issue is then whether, in light of these reduced costs, the charge made to the growers was in excess of the "current commercial charge." It is quite possible that with the reduced costs resulting from the FGS rebates, the charge to the growers exceeded the "current commercial rate." This is a proper question for the jury to resolve.

### V.

### WARNER'S STATEMENTS

■ YCC strenuously argues that it was error for the district judge to allow three witnesses to testify to statements made by Art Warner, a former manager of YCC. It was anticipated that plaintiffs would call Warner as a witness at trial. A week before trial, Warner had a conference with counsel and several other witnesses, preparatory to trial. Warner had suffered a stroke some time before and was in fragile health. The day before trial, he furnished a doctor's certificate that to testify would endanger his health. All parties agree that he was unavailable. His deposition had not been taken. The plaintiffs sought to have several witnesses testify as to his statements at the conference in the attorneys' office. At a motion *in limine* hearing, the district judge entered an order allowing such testimony under Fed.R.Evid. 804(b)(5). This was clearly error. There were no "equivalent circumstantial guarantees of trustworthiness" in this situation as required by the rule. Warner was not under oath, he was responding to questions of his attorney, which would normally elicit favorable responses, and there would be subtle pressures to be in accord with other favorable witnesses present in the attorneys' office.

Plaintiffs assert this was harmless error in light of other statements made by Warner while he was manager and were thus party admissions. We need not make this determination since the case is being reversed on other grounds. However, we note that this is a difficult position to sustain in light of the requirement of 804(b)(5)(B) that the out-of-court statements be "more probative on the point for which [they are] offered than any other evidence which the proponent can procure through reasonable efforts." In any event, these statements of Warner made in the attorneys' office should not be permitted on retrial.

### VI.

### OTHER EVIDENCE

■ YCC contends it was error to exclude evidence of the charges made by other packing houses on the ground it was irrelevant. We need not determine whether it was error to exclude the particular evidence excluded by the district court. Evidence of the charges of other packing houses in the area is certainly relevant to determining the "current commercial rate" under the terms of the contract. It would

be necessary to have evidence to establish what the "current commercial rate" was in order to determine whether the grower class had been overcharged.

REVERSED and REMANDED.