566 P.2d 1044

**EMPIRE MACHINERY CO., an Arizona Corporation, Appellant,**

v.

**LITTON BUSINESS TELEPHONE SYSTEMS, DIVISION OF LITTON SYSTEMS, INC., Litton Systems, Inc., a Delaware Corporation, Litcom, a division of Litton Industries, Inc., Litton Industries, Inc., a Delaware Corporation, Appellees.**

No. 1 CA–CIV 3188.

Court of Appeals of Arizona,
Division 1,
Department C.

July 6, 1977.

Review Denied Sept. 20, 1977.

Ryley, Carlock & Ralston by George Read Carlock, James E. Brophy, III, N. Warner Lee, Phoenix, for appellant.

Lewis & Roca by Roger W. Kaufman, Paul G. Ulrich, Kimball J. Corson, Phoenix, for appellees.

JACOBSON, Presiding Judge.

This is a contract action in which we are called upon to determine whether execution of a "home office acceptance" clause is the exclusive means by which a contract can be made binding.

This action was instituted by Empire Machinery Co. (Empire) against Litton Systems Co. and various divisions and subsidiary companies of Litton Systems Co. (collectively referred to as Litton) seeking damages for breach of a contract to install an "interconnect" telephone system for Empire's use. On cross-motions for summary judgment, the trial court granted judgment in favor of Litton, in essence finding, as a matter of law, that a binding contract was never consummated between the parties. Empire has appealed.

The facts are not in material dispute between the parties.

Empire is the dealer for Caterpillar Tractor Company in Arizona. In the summer of 1973, Empire became interested in acquiring an "interconnect" telephone system. An "interconnect" system is one in which the telephone customer owns the "in-house" switching equipment, telephones and wiring, as compared to this equipment being owned by the telephone company, in this case, Mountain Bell. Litton is a manufacturer and seller of interconnect systems and

on April 2, 1973, Russell R. Murphy, National Accounts Manager for Litton wrote Empire a letter extolling the virtues of the Litton system and enclosing a card to be returned to Litton if Empire was interested in its system. Empire returned the card and on April 17, 1973 Murphy personally contacted Empire.

During this visit, Murphy explained that Litton was developing a "Superplex" switching system which would be available in approximately a year. Mr. Ronald E. Mathis, Jr., communications coordinator for Empire, expressed interest in Litton's system which embraced the "Superplex" switch.

On June 5, 1973, Litton, through Murphy, submitted a proposal to Empire which was rejected. Negotiations continued between Murphy and Mathis until July 30, 1973. On that date, Murphy submitted a letter to Empire which stated in pertinent part that:

"To confirm our previous discussions, upon receipt of a signed order and deposit, Litton BTS will install a Common Control Crossbar Telephone System on your premises. This system will be replaced upon your request and in accordance with our normal delivery schedule with our computer-controlled electronic solid state TDM system ["Superplex"] at no further expense to your company."

Following receipt of this letter from Murphy, Mr. Jack W. Whitman, president of Empire, signed an "Equipment Sales Agreement" and delivered to Murphy a check in the sum of $8,546.00, as the down payment. Murphy, on the Equipment Sales Agreement, acknowledged receipt of this amount.

This Equipment Sales Agreement contained on its face a clause which read:

"6. This agreement shall become effective and binding upon the Purchaser and BTS [Litton] only upon approval, acceptance, and execution hereof by BTS and its home office."

At the right hand bottom of the front page, the following appeared:

"Approved and Accepted by Litton Business Telephone, Division of Litton Systems, Inc. (Seller)
"By:

_____

(Signature)

_____

(Type Name and Title)

_____

(Date)                     "

It is acknowledged that Murphy did not sign this portion of the contract. It is also acknowledged that Empire's President, Mr. Whitman, read and understood paragraph 6 quoted above. The estimated date for installation of the Litton system was set at November 15, 1973.

On August 9, 1973, Mathis, on behalf of Empire, was requested by Murphy to send a form letter to Mountain Bell designating Litton as Empire's representative with authority to act in connection with the installation of the interconnect system. The form letter supplied by Litton contained the following lead paragraph:

"We have this date entered into a contractual agreement with LITTON BTS Division, Litton Systems, Inc. for the installation of an 'interconnect telephone system'."

On August 30, 1973, John Parlett, National Systems Representative for Litton, wrote Mountain Bell advising that company of the details of the installation of the interconnect system. The letter contained the following lead paragraph:

"We have this date entered into a contractual agreement with Empire Machinery Company for the installation of an 'interconnect' telephone system."

Empire, at Litton's request, purchased approximately $12,000 worth of electrical equipment to facilitate Litton's equipment.

On December 3, 1973, W. P. Scott, service manager of Litton, requested that Mountain Bell supply a new telephone number for Empire to be put in service as of December 21, 1973. Nothing further was done by either party in furtherance of the contract. Litton never shipped nor prepared the interconnect system.

Apparently Litton encountered difficulties in perfecting its "Superplex" system and on January 10, 1974, Mr. E. E. Bolles, then Mountain Area Manager for Litton, met with Murphy and Mathis and advised Mathis that Litton would be unable to supply Empire with a "Superplex" interconnect telephone system. At that time Bolles tendered back Empire's down payment. This oral tender was verified by a letter the following day.

Subsequently, Empire purchased a Stromborg-Carlson interconnect telephone system in lieu of the Litton system. The electrical equipment purchased by Empire was substantially adaptable to the Stromborg-Carlson system. This litigation then ensued.

The parties have presented several issues for our determination, which may be summarized into two issues as follows:

1. Did Murphy's letter of July 30, 1973 constitute an offer to sell which was accepted by Empire executing the Equipment Sales Agreement so as to constitute a binding agreement?

2. If not, did the Equipment Sales Agreement constitute an offer by Empire to purchase which could only be accepted and made binding by Litton at its home office in accordance with paragraph 6 of that agreement?

■ Empire first contends that the letter from Litton dated July 30, 1973, signed by Murphy which stated "upon receipt of a signed order and deposit, Litton BTS will install an ['interconnect system'] on your premises", constituted an offer to sell. They further argue that having complied with that offer by signing the Equipment Sales Agreement and giving Murphy a check in the sum of $8,546.00, they accepted that offer and a binding contract was created. The problem with this reasoning is that it ignores the express language of the Equipment Sales Agreement, stating that the agreement would become effective and binding "only upon approval, acceptance,

and execution hereof by BTS and its home office." Because of this language, we believe the correct rule is that stated in 1 Corbin, Contracts § 88 (1963):

"When one party solicits and receives an order or other expression of agreement from another, clearly specifying that there is to be no contract until ratification or assent by some officer or representative of the solicitor, the solicitation is not itself an offer; it is a request for an offer. The order that is given upon such a request is an offer, not an acceptance."

We therefore hold that Murphy's letter of July 30, 1973 constituted a request for an offer from Empire, and that the Equipment Sales Agreement was in compliance with that request and therefore an offer which required Litton's acceptance.[1]

■ This brings us to the second issue presented, that is, the offer having designated the manner in which it would be accepted, is this the exclusive means by which that acceptance can occur? Empire has argued in this matter that future discovery might disclose that in fact Litton did accept, approve and execute the Equipment Sales Agreement. The simple answer to this contention is that Litton moved for summary judgment on the basis that the agreement was not accepted, approved or executed by "BTS and its home office". Empire did not request a continuance of this motion in order to complete discovery on this point. See Rule 56(f), Rules of Civil Procedure, 16 A.R.S. We therefore assume, for the purposes of this appeal, that there was no formal execution of the Equipment Sales Agreement by "BTS and its home office."

The crux of the problem is thus presented. Litton argues that because of clause 6 in the contract, Empire's offer was never accepted in the manner designated and therefore a binding contractual relationship never existed between the parties. Empire

1. Litton has also argued alternatively that Murphy had no authority to make a binding offer on its behalf. Since we determine that the letter constitutes only a request for an offer, we need not determine Murphy's authority in this context.

argues that clause number 6 can be waived by it and assented to by Litton and the conduct of Litton subsequent to the submission of the Equipment Sales Agreement shows such an assent or at least a fact issue which would preclude summary judgment. Litton counters this argument by contending that in any event, the conduct relied upon by Empire to show assent was performed by agents who had no authority to bind Litton.

As the ground floor for both Litton's and Empire's positions, both cite A.R.S. § 44–2313 (§ 2–206, Uniform Commercial Code), which provides in part:

"A. Unless otherwise unambiguously indicated by the language or circumstances:

"1. An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances."

Empire points to the language contained under paragraph 1 of this statute and contends the conduct of Litton constitutes, as a matter of law, an acceptance of its offer under the Equipment Sales Agreement. Litton, on the other hand, points to the lead paragraph of this statute and argues that paragraph 6 of the Equipment Sales Agreement, as a matter of law, "otherwise unambiguously indicated" that only home office acceptance shall constitute an acceptance of the contract. In our opinion, both arguments miss the mark.

As the official comment to § 2–206 of the Uniform Commercial Code (adopted as A.R.S. § 44–2313) makes clear, this section was an attempt to simplify the common law rule that an acceptance of a contract could only be made in the manner and medium of the offer, that is, a written offer could only be accepted by an acceptance in writing. Litton is correct that this statute did not intend to change the common law rule that if an offer by its terms indicated that acceptance would only be made in a particular manner, one must comply with the particular manner. See UNIFORM COMMERCIAL CODE, § 2–206, Comment 1 (1969). Nor is such an acceptance clause contrary to the Uniform Commercial Code. West Penn Power Co. v. Bethlehem Steel Corp., 236 Pa.Super. 413, 348 A.2d 144 (1975) (holding that U.C.C. § 2–206(1)(a) envisions "home office" acceptance clauses.)

However, even under the common law, a contract containing a clause that acceptance can only be made by approval of officers at the home office could be accepted in a manner other than by such written approval. See Pratt-Gilbert Co. v. Renaud, 25 Ariz. 79, 213 P. 400 (1923) (holding that complete performance of contract constituted acceptance); Armour & Co. v. Celic, 294 F.2d 432 (2d Cir. 1961); Ludowici-Celadon Co. v. McKinley, 307 Mich. 149, 11 N.W.2d 839 (1943); Columbia Weighing Mach. Co. v. Vaughan, 123 Kan. 474, 255 P. 973 (1927); Albright v. Stegeman Motorcar Co., 168 Wis. 557, 170 N.W. 951 (1919).

At this point, it is important to clarify the respective positions of the parties to this contract. We have previously held that insofar as the Equipment Sales Agreement was concerned, Empire was the offeror and Litton the offeree. This is important for it is the offeror who creates the power of acceptance. Restatement of Contracts, § 52 (1932); 17 Am.Jur. Contracts, § 31, § 41 (1964). While normally, in transactions such as this where the offer to purchase is made on forms supplied by the seller, the buyer may adopt the manner of acceptance suggested by the seller. However, it is clear under such circumstances that the offeror who has the power to control the manner of acceptance may waive that requirement, 1 Corbin Contracts § 88 (1963). It is equally clear that the offeree can rely upon that manner of acceptance specified in the contract and the offeror's "waiver" of the manner of acceptance cannot create a contract without the assent of the offeree. See Power Service Corp. v. Joslin, 175 F.2d 698 (9th Cir. 1949). This assent may be sufficiently expressed by the conduct of the soliciting offeree so as to bring into being a binding contract. Dunkel Oil Corp. v. Independent Oil & Gas Co.,

70 F.2d 967 (7th Cir. 1934); 1 Corbin; Contracts § 88 (1963).

■ The conduct on the part of the offeree which will constitute assent under these circumstances must be directed towards fulfilling the contractual obligation (that is, beginning performance) and that conduct must be conveyed by the offeree to the offeror. *Albright v. Stegeman Motorcar Co., supra.* Moreover, the conduct must be by persons who have at least apparent authority to bind the offeree. *See O'Daniel Motors, Inc. v. Handy,* 390 S.W.2d 453 (Ky. Ct.App.1965) (holding that sales contract for used car which required approval of dealer was not made binding on dealer by delivery of car by salesman who had no authority to bind dealer.)

■ With these principles in mind, the resolution of this appeal requires a determination of (1) whether the conduct of Litton in this matter was directed toward the fulfilling of its obligations so as to sufficiently express its assent to the Equipment Sales Agreement and (2) if so, whether such conduct was performed by individuals who had authority to bind Litton.

The conduct of Litton contended by Empire to constitute assent is as follows:

(1) Murphy's request to Empire that Empire inform Mountain Bell that Litton was Empire's representative to install the "interconnect" system and the existence of a contractual relationship between Litton and Empire.

(2) Parlett's letter of August 30, 1973, on behalf of Litton to Mountain Bell advising Mountain Bell of the contractual relationship existing between Litton and Empire and advising of the details of the installation of the "interconnect" system.

(3) The purchase by Empire of $12,000 worth of equipment in reliance upon the installation of the Litton "interconnect" system.

(4) The cashing of Empire's down payment check and the retention of the proceeds of that check.

(5) The request by Scott, Litton's Service Manager, to Mountain Bell for a new telephone number for Empire's business.

We will analyze each of these to determine whether the conduct, (1) constituted beginning performance of the contractual obligation and, (2) whether the conduct was performed by individuals who could bind Litton by its conduct.

As to Murphy's request that Empire inform Mountain States that a contractual obligation existed between Litton and Empire, we would agree that such conduct could be considered by a trier of fact as constituting assent to the formation of a binding contractual relationship between the parties, if performed by an individual having authority to bind Litton. However, we also agree upon the record presented here that Murphy had no authority expressed or apparent to bind Litton. Here Empire was put on notice by paragraph 6 of the contract that Murphy had no authority to bind Litton by his actions. *See* Restatement (Second) of Agency § 166 (1958). While it might be argued that this lack of authority only went to Murphy's ability to execute binding contracts and not subsequent conduct, we can see no logical difference between Murphy's conduct after receiving the order and the conduct of the used car salesman in *O'Daniel Motors, Inc. v. Handy, supra,* in delivering possession to the buyer of the used car. We therefore conclude upon the record presented here that Murphy had no apparent authority to bind Litton by his letter.

■ The same cannot be said of Parlett, National Systems Representative, and his letter of August 30, 1973, advising Mountain Bell of the contractual relationship existing between Litton and Empire. While Parlett may, in fact, have no actual authority to bind Litton, there is nothing in the record to indicate his buyer was aware of that defect. Moreover, we note that Parlett apparently represents a different division of Litton BTS than Murphy, his headquarters are in a different city than Murphy and on the face of his letter he appears to speak with the authority to bind Litton. In short, we are of the opinion that a ques-

tion of fact exists as to whether Parlett's letter of August 30, 1973 constituted an assent by Litton to be bound by the Equipment Sales Agreement and whether Parlett had apparent authority to so bind Litton. The same can be said of Scott's letter to Mountain Bell concerning change of telephone numbers. In this regard, Empire's purchase of equipment in reliance on this authority, if this be the fact, can be considered by the trier of fact.

Likewise, in our opinion the cashing of Empire's down payment check raises an issue of fact as to whether Litton assented to the contract. We view this conduct not in the context of ratification of an agent's acts, but as evidence that Litton assented to the contractual relationship by converting the negotiable instrument. *See Restatement of Contracts*, § 72(2) (1932). We agree with Litton that the mere acceptance of the check in accordance with the terms of the offer does not constitute any evidence of binding conduct on Litton's part. It is the cashing of that check and the retention of the proceeds over a period of several months that gives rise to the factual inferences as to Litton's intent to enter into a binding contractual relationship with Empire. Since the record is silent as to who in the Litton organization negotiated the instrument, that individual's authority to do so must abide the trial of this matter.

Litton argues that in any event all of the conduct referred to by Litton does not amount to "substantial performance" of the Equipment Sales Agreement and therefore as a matter of law cannot constitute an assent of that contract. In this regard, Litton equates substantial performance to conduct dealing with the actual installing, assembling or shipping of the "interconnect" system—conduct Litton did not embark upon. Admittedly, the cases relied upon by Empire have these elements. However, in our opinion, the rule should be that if the offeree takes steps in furtherance of its contractual obligations which would lead a reasonable businessman to believe that the contract had been accepted, such conduct may, under the circumstances, constitute acceptance of the contract.

We therefore hold that factual issues were presented, both as to whether the conduct shown here was in furtherance of Litton's contractual obligations and whether the persons engaging in that conduct had authority, actual or apparent, to do so. Such material, factual issues preclude the granting of summary judgment to either party.

Judgment reversed and the matter remanded for proceedings consistent with this opinion.

HAIRE and OGG, JJ., concur.