844 P.2d 641

**STATE of Arizona, Plaintiff–Appellee,**

**v.**

**Evan MECHAM and Florence Mecham, husband and wife, Defendants– Appellants.**

No. 1 CA–CV 90–423.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 29, 1992.

Review Denied Feb. 2, 1993.*

---

Guttilla & Murphy by Patrick Murphy, Phoenix, for plaintiff-appellee.

Crowe & Scott by Michael B. Scott, Phoenix, for defendants-appellants.

## OPINION

TOCI, Judge.

Following the 1986 general election, several of then-Governor Mecham's supporters formed an Inaugural Committee (the "Committee"). The Committee raised money and deposited it in the Mecham Inaugural Fund to finance Governor Mecham's private inaugural activities and to pay off his campaign debt. The Maricopa County Attorney (the "County Attorney") threatened to sue the Committee, claiming its activities violated newly-enacted campaign finance laws. The Committee compromised the dispute by transferring the Mecham Inaugural Fund to the office of the Governor. Once transferred to the Governor's office, the money was referred to as the "Protocol Fund."

After the Governor was impeached and removed from office, he claimed the Protocol Fund belonged to him and refused to turn over the money to his successor. This suit resulted. The trial court granted the State's motion for summary judgment and awarded to the State the money in the Protocol Fund, civil penalties, and attorney's fees.

The Mechams appeal only from the denial of their motion to vacate the judgment and for new trial ("motion to vacate"). We hold that the facts produced in support of Mechams' claim have so little probative value that reasonable people could not conclude either that the Committee acted without authority, or that the Protocol Fund held by the Governor in his official capacity was anything other than "public money."

We, therefore, affirm the trial court's denial of the Mechams' motion to vacate.

## I. FACTS AND PROCEDURAL HISTORY

The following facts are uncontroverted. In 1986, Arizona voters elected Evan Mecham Governor of Arizona. At the same general election, the voters enacted Proposition 200, which became effective on December 16, 1986. See Ariz.Rev.Stat.Ann. ("A.R.S.") § 16–905. Proposition 200 limits the amounts that individual contributors and committees can donate to a political candidate in an election campaign.

After Mecham won the general election, his supporters organized a committee to plan and finance an inaugural ball and reception. At Governor Mecham's request, William Long served as chairman and had authority to act for the Committee. The Committee, an unincorporated association, remained completely independent from and was not controlled by Governor Mecham or his administration.

In December 1986, the Committee began to sell inaugural ball tickets imprinted with the words: "Proceeds to defray Ball expenses and retire campaign obligations." The Committee did use part of the funds raised to pay the expenses of the inaugural ball and reception, and it intended to use the balance of the funds to retire Mecham's campaign debts.

At the request of the Attorney General's office, the County Attorney investigated the Committee's activities. He concluded that the Committee's fund-raising efforts violated the recently-enacted A.R.S. section 16–905. According to the County Attorney, the State was entitled to recover all the remaining inaugural ball funds held by the Committee.

After learning of the allegations that the Committee had violated the campaign finance laws, Long retained two lawyers, Warner Lee and John Mangum, to advise the Committee. The lawyers later concluded that the Committee might have unknowingly violated section 16–905 and other election laws by using corporate donations to pay inaugural expenses.

The Committee decided to compromise the dispute rather than incur the delay, expense, and political repercussions of seeking a declaratory judgment to decide the issue. It recognized that its members faced the risk of personal civil liability for treble damages or possibly even criminal charges. In addition, the Committee might forfeit the inaugural funds to the State general fund as a penalty if the State won.

To avoid a possible forfeiture of the funds, the Committee's attorneys proposed transferring the funds to the State so "the Governor's office could use [the funds] for a legitimate state purpose in the interest of the Governor...."

Under the terms of the compromise reached by the Committee and the County Attorney, the Committee agreed to transfer the funds ($90,524) to the Governor's office for use according to the terms of A.R.S. section 41-1105. In return, the County Attorney agreed to halt the threatened civil proceedings against the Committee. After transferring the funds to the Governor's office, Long confirmed the compromise agreement in a letter to County Attorney Tom Collins dated June 26, 1987.

The June 26, 1987 letter assured the County Attorney's office "all funds remaining in the Ticket Sales Account ... have been turned over to the office of the Governor...." The County Attorney's office relied upon the letter and stopped its investigation of the Committee.

As a member of the Committee, Joyce Downey delivered the passbook for the Mecham Inaugural Fund account to the Governor's office. Afterward, the Committee's lawyers met with Jim Colter, the Chief of Staff, and other representatives of the Governor's office. The Committee's lawyers explained the compromise agreement and the restrictions placed upon the Protocol Fund. Governor Mecham attended part of the meeting. Colter introduced members of the Committee to Governor Mecham "as people who had been working on the problem with the Mecham Inaugural Committee Fund."

Following Governor Mecham's impeachment conviction and removal from office,

the Attorney General demanded that Governor Mecham turn the funds over to his successor. Instead, Mecham transferred the Protocol Fund to a new account on which he was the signatory. He refused to relinquish the funds, claiming that they were private funds that had been given to him individually. He claimed that Long only had authority to use the funds to retire Governor Mecham's campaign debt. Governor Mecham then tried to disburse the funds to individual ticket purchasers.

The State sued the Mechams to recover the Protocol Fund, for civil penalties, and for attorney's fees. After the court granted defendant Valley National Bank's motion to interplead the funds, the clerk of the superior court held the Protocol Fund balance of $79,782.41. The parties then filed cross motions for summary judgment.

On February 27, 1990, the trial court granted the State's motion for summary judgment. It awarded the Protocol Fund held by the clerk of the court to the State and assessed a statutory civil penalty and attorney's fees. The clerk of the court delivered the balance of $86,970.75 in the Protocol Fund to the Governor of Arizona. The Mechams filed a motion to vacate judgment and requested a new trial. *See* Ariz. R.Civ.P. 59(a). On May 22, 1990, the court denied the Mechams' motion.

On June 5, 1990, the Mechams timely appealed from the order denying the motion to vacate judgment. This court has jurisdiction pursuant to A.R.S. section 12-120.21.

## II. DISCUSSION

### A. STANDARD OF REVIEW

██ The Mechams did not appeal from the summary judgment entered for the State. However, a motion for new trial may appropriately challenge a grant of summary judgment. *United Bank of Arizona v. Allyn*, 167 Ariz. 191, 197, 805 P.2d 1012, 1018 (App.1991). The Mechams' motion to vacate thus requires us to examine the propriety of the trial court's grant of summary judgment for the State.

The standard adopted in *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990), for adjudicating motions for summary judgment directs the trial court to grant the motion "if the facts produced in support of the claim or defense have so little probative value ... that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id.* at 309, 802 P.2d at 1008. Here, we must determine whether the Mechams presented evidence from which reasonable people could conclude either that: (1) the Committee lacked authority to compromise the dispute and transfer the funds to the Governor's office, or (2) the inaugural funds transferred to the office of the Governor under A.R.S. section 41–1105 were not held as public money.

## B. THE COMPROMISE AGREEMENT TO TRANSFER THE INAUGURAL BALL TICKET PROCEEDS TO THE OFFICE OF THE GOVERNOR

### 1. The Authority of William Long to Act for the Committee

■ We conclude that the State established a prima facie case entitling it to summary judgment on the issue of Long's authority to act for the Committee. We also conclude that the Mechams did not produce competent evidence to justify a trial on that issue.

Summary judgment is appropriate when the record shows no real dispute exists as to any material facts and the moving party is entitled to judgment as a matter of law. Ariz.R.Civ.P. 56(c); *United Bank*, 167 Ariz. at 194–95, 805 P.2d at 1015–16. The party seeking summary judgment has the burden of satisfying this standard and demonstrating both the absence of any factual conflict and the right to judgment as a matter of law. *Id.*, 167 Ariz. at 195, 805 P.2d at 1016.

■ The State argues that the Mechams had the burden of showing that summary judgment was not appropriate. It says that the Mechams' failure to assert disputed material facts precluding summary judgment in their response to the State's motion rendered summary judgment appropriate. We disagree.

■ The Mechams' motion to vacate judgment and for new trial did raise the issue of whether the court properly granted summary judgment. This motion "gave the superior court an opportunity to correct any error and ... preserved as an issue for appeal the sufficiency of the ... evidence to justify summary judgment." *Id.*, 167 Ariz. at 197, 805 P.2d at 1018. Furthermore, on appeal this court may review the entire record to determine whether the trial court abused its discretion in denying a motion for new trial directed against a summary judgment. *Matcha v. Winn*, 131 Ariz. 115, 116–17, 638 P.2d 1361, 1362–63 (App.1981).

A movant who has the burden of proof at trial, such as the State in this case, must carry the burden of producing uncontroverted prima facie evidence in support of its motion for summary judgment. *United Bank*, 167 Ariz. at 196, 805 P.2d at 1017. Here, the State established a prima facie case for summary judgment through the sworn testimony of Mangum, Lee, and Governor Mecham himself given at the impeachment hearings.

Once the State established a prima facie case entitling it to summary judgment, the Mechams had the burden of showing available competent evidence that would justify a trial. *United Bank*, 167 Ariz. at 196, 805 P.2d at 1017; *Brown Wsle. Elec. Co. v. Safeco Ins. Co. of America*, 135 Ariz. 154, 158, 659 P.2d 1299, 1303 (App.1982). A party cannot rely solely on unsupported contentions that a dispute exists to create a factual issue that would defeat summary judgment. *Brown*, 135 Ariz. at 158, 659 P.2d at 1303.

In ruling on a motion for summary judgment, the trial court will generally consider "facts" as "admissible in evidence" when set forth in an affidavit or a deposition; unsworn and unproven assertions are not "facts." *Prairie State Bank v. I.R.S.*, 155 Ariz. 219, 221 n. 1A, 745 P.2d 966, 967 n. 1A (App.1987). Here, the Mechams did not produce admissible evidence, by affidavit or any other means, that controverted testimony given by Warner Lee and John Man-

gum at the impeachment hearings that William Long had authority to act for the Inaugural Committee. The Mechams' denial of the statement of facts in support of the State's motion for summary judgment contained merely a legal argument that characterized the State's facts as "wrong" or "irrelevant" without establishing the availability of competent evidence to justify a trial.

Furthermore, Governor Mecham's own impeachment hearing testimony refutes his assertions that Long lacked authority to act for the Committee:

> Q. So it was an unauthorized act by Mr. Long to reach the agreement with the County Attorney, as far as you are concerned?
>
> . . . .
>
> THE WITNESS [Mr. Mecham]: Mr. French, I was not part of the discussions. *I wouldn't say that Mr. Long did anything unauthorized.* I believe that we should properly characterize this. I was extremely busy with other affairs. I was talked to peripherally about this. *I wouldn't say Mr. Long did anything unauthorized.*
>
> When you—when somebody constitutes a committee, this was the work of the committee. It was not the work of me, and they were the ones that were involved. And it was nothing to do with me personally, and therefore, *I don't believe you're proper in trying to cast a finger at Mr. Long as doing something unauthorized. He had full charge of the Committee. He was the chairman.*

(Emphasis supplied.)

Alternatively, the Mechams attack the scope of Long's authority to act for the Committee. They argue that even if Long had authority to act for the Committee, his authority was limited to the inaugural festivities. Again, we reject the Mechams' arguments because they presented no admissible evidence that would create a material issue of fact that Long's authority was restricted in any way. Governor Mecham himself testified at the impeachment hearings that Long had "full charge of the committee."

The Mechams also argue that Long had no authority to "bind Governor Mecham to the terms of the settlement agreement without Mecham's consent." The Mechams came forward with no admissible evidence to show an issue of fact existed over whether Long's authority was conditioned on Governor Mecham's consent. Indeed, Mecham testified to the contrary in the impeachment hearings. When Mecham admitted that Long was not "unauthorized," he testified that the Committee created the settlement and it "had nothing to do with [Mecham] personally."

Therefore, under the *Orme School* standard, the trial court properly granted summary judgment on the issue of Long's authority to act for the Committee. On the basis of the evidence, "no reasonable juror could conclude" that Long's authority to act for the Committee was limited or that a settlement was conditioned on Governor Mecham's consent. *See Orme School,* 166 Ariz. at 311, 802 P.2d at 1010.

### 2. The Compromise Agreement as a Binding Contract

 We agree with the State that Long entered into a binding settlement agreement when he transferred the Mecham Inaugural Fund to the Governor's office. First, the transfer constituted the compromise of a disputed claim, and thus the transfer was supported by consideration. Second, under basic contract principles, the delivery of the Mecham Inaugural Fund by the Committee to the Governor's office constituted both the acceptance of an offer to compromise and the performance of the compromise agreement.

On April 20, 1987, the Committee's lawyers met with the County Attorney's office to attempt a compromise of the dispute. The Committee's lawyers proposed simple compromise terms: the Committee would transfer its remaining funds to the Governor's office; the Governor would accept and disburse the funds according to the provisions of A.R.S. section 41–1105. In return, the County Attorney would halt the proceedings against the Committee.

Mangum testified that the County Attorney agreed to a settlement of the dispute on the Committee's terms, subject to Long's approval. Under these circumstances, the County Attorney's assent to the compromise agreement constituted an offer to enter into a contract with the Committee.

> When one party solicits and receives an order or other expression of agreement from another, clearly specifying that there is to be no contract until ratification or assent by some officer or representative of the solicitor, the solicitation is not itself an offer; it is a request for an offer. The order that is given upon such a request is an offer, not an acceptance.

*Empire Mach. Co. v. Litton Bus. Tel. Sys.*, 115 Ariz. 568, 571, 566 P.2d 1044, 1047 (App.1977) (quoting 1 Corbin, *Contracts* § 88 (1963)).

Mangum and Lee, as agents for the Committee, could not accept the County Attorney's offer without the Committee chairman's approval. *See* Restatement (Second) of Contracts § 52 comment c (absent contrary statement, agent may accept offer for principal) (citing Restatement (Second) of Agency § 292). Provided Long accepted before the County Attorney withdrew the offer, the parties mutually assented to a binding contract. *See* Restatement (Second) of Agency § 88 ("Ratification must occur, however, before the offeror manifests withdrawal from the transaction and before termination of the offeree's power of acceptance.").

The County Attorney's offer to compromise the dispute could either be accepted in writing or by performance. *See Empire Mach. Co.*, 115 Ariz. at 572–73, 566 P.2d at 1048–49; Restatement (Second) of Contracts § 32 ("In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses."). We conclude that when the Committee delivered the account passbook to the Governor's office and changed the signature cards, it accepted the County Attorney's offer to

compromise and performed the bargained-for exchange.

The Mechams contend that Long had no power to agree to a compromise on June 26, 1987, because he had already transferred the funds to the Governor's office. We reject this argument. The Committee performed its part of the compromise agreement before June 26, 1987, by delivering the passbook to the office of the Governor. The letter of June 26, 1987, simply notified the County Attorney that the Committee had performed the agreement. *See* Restatement (Second) of Contracts § 54 (if offeree who accepts by rendering performance has reason to know the offeror has no adequate means of learning of performance, the contractual duty of the offeror is discharged unless the offeree notifies the offeror of acceptance within a reasonable time).

Finally, Mecham argues that the compromise agreement is not supported by consideration because the County Attorney had no valid claim that the Committee violated the election laws. This argument is without merit. Whether the County Attorney was right or wrong is immaterial here.

> The settlement of a controversy is valid and binding, not because it is the settlement of a valid claim, but because it is the settlement of a controversy. And when such settlement is characterized by good faith, the court will not look into the question of law or fact in dispute between the parties, and determine which is right.

*Brecht v. Hammons*, 35 Ariz. 383, 389, 278 P. 381, 391 (1929) (citation omitted). *See also Gill v. Kreutzberg*, 24 Ariz.App. 207, 209, 537 P.2d 44, 46 (1975) (forbearance to assert a claim in which a party has a reasonable belief is valid consideration for a contract).

We find that the evidence is uncontroverted that the Committee made the settlement in good faith. Both of the Committee's lawyers concluded that the Committee may have violated A.R.S. section 16–905 and other election laws. The County Attorney had already reached the same conclusion. The Committee was not required to

risk incurring criminal and civil penalties in a speculative effort to save Governor Mecham from his campaign debts.

C. THE NATURE OF THE FUNDS TRANSFERRED TO THE GOVERNOR'S OFFICE

1. The Mechams' Evidence That The Protocol Fund Was Not Public Money

■ The Mechams argue that the Protocol Fund is not "state money" and that only funds owned by the state and deposited in the state treasury are state money. Thus, according to the Mechams, the funds are private funds to which the State has no claim. However, the Mechams misunderstand the issue; the question is not whether the funds are "state money" but whether the funds are "public money."

■ We conclude that the term "public money" includes not only state-owned funds but also private money held by State officials in their official capacity. We agree with the State that when the Committee transferred its funds to the office of Governor to be held pursuant to the terms of A.R.S. section 41-1105, the funds were accepted by the Governor's office and they became "public money."

Arizona Revised Statutes section 35-302 supports our conclusion.[1] It clearly makes both money held by state officers in their official capacity as well as money owned by the state "public money." We are also persuaded by the California cases discussing "public money" because Arizona's definition in section 35-302 is similar to section 426 of the California penal code. *See* Cal. Pen.Code § 426.[2] *See People v. Griffin,* 170 Cal.App.2d 358, 361-62, 338 P.2d 949, 952-63 (1959) (interpreting Cal.Pen.Code § 426).

*Griffin* involved the conviction of a municipal deputy clerk for the embezzlement of bail bonds. On appeal, the defendant argued that the court should reverse the conviction because she was prosecuted under the wrong statute. She contended that pre-forfeiture bail deposits were private funds and not "public money." The court concluded, however, that because the deputy clerk held the private bail deposits in her official capacity as court clerk, the funds were "public moneys." 170 Cal.App.2d at 363, 338 P.2d at 951-52. "The official character in which money are received or held is the proper criterion of whether or not they are 'public moneys' under said Section 424." *Id.; see also People v. Crosby,* 141 Cal.App.2d 172, 174-75, 296 P.2d 438, 440 (1956) (embezzled private estate funds were "public funds" because public fiduciary held them in his official capacity).

Arizona Revised Statutes section 35-212 also buttresses our holding. The 1983 amendment to this statute clearly indicates the legislative intent to expand the definition of "public money" to include money that does not fall within the definition of "state money." Before its amendment, A.R.S. section 35-212 allowed the attorney general to recover only wrongfully expended "state money." The amendment extended the attorney general's injunctive and civil remedies to the wrongful expenditure of "public money." Significantly, the legislature defined "public money" as "all monies coming into the lawful possession ... [of] a state officer ... in his official capacity, *irrespective of the source from which,* or the manner in which, the monies are received." A.R.S. § 35-212(B) (emphasis supplied).

We now turn to the question whether Governor Mecham held the Protocol Fund in his official capacity. The June 26, 1987

**1.** A.R.S. § 35-302 states:
The phrase 'public money' as used in this article includes bonds and evidence of indebtedness, and *money* belonging to, *received or held by, state,* county, district, city or town *officers in their official capacity.*
(Emphasis supplied.)

**2.** Penal Code, Section 426 provides:

The phrase "public moneys" as used in the two preceding sections, includes all bonds and evidence of indebtedness, and all moneys belonging to the State, or any city, county, town, or district therein, and all moneys, bonds, and evidences of indebtedness received or held by State, county, district, city, or town officers in their official capacity.

letter answers this question.[3] The letter clearly states that the Committee transferred the funds—not to Mecham personally or even to Governor Mecham—but to the office of the Governor of Arizona. Once the Governor's aides accepted the money, the funds became "public money" because Mecham held the funds in his official capacity as Governor of the State of Arizona. *See* A.R.S. §§ 35–302 and –212.

The Mechams rely upon *Estate of Arizona Southwest Bank*, 41 Ariz. 507, 19 P.2d 1063 (1933), to support their claim that the Protocol Fund is not "state money." On the contrary, the issue in *Arizona Southwest Bank* was whether certain funds were "public money" under a statute containing language similar to A.R.S. section 35–302. The court held that because a high school principal was not acting as an officer of the school board in collecting a summer school attendance fee from high school pupils, the money collected never became "public money." Here, however, A.R.S. section 41–1105 specifically authorizes the Governor to accept and expend private funds for certain limited purposes. The Committee transferred the funds to the office of the Governor, and Governor Mecham accepted the money in his official capacity as Governor pursuant to that statute. Although the funds were not "state money," they are "public money." *See* A.R.S. §§ 35–302 and –212.

The Mechams further argue that if we give effect to the language of A.R.S. section 41–1105, we must reject the conclusion that the Protocol Fund is "public money" under either A.R.S. sections 35–302 or –212. They contend that if the money becomes "public funds" when the Governor holds it in an official capacity, the language in A.R.S. section 41–1105 authorizing the Governor to expend "private funds" is rendered meaningless. We disagree.

When the legislature enacted A.R.S. section 41–1105, *see* 1978 Ariz.Sess.Laws, ch. 209, § 11, no statutory remedy existed for the recovery of funds illegally used or expended under that statute. The remedies prescribed in A.R.S. section 35–212 were limited to the recovery of "state money"; that is, money in the State treasury or money held by the State treasurer. *See* A.R.S. § 35–321(6).

■ The legislature has since defined "public money" broadly to include not only "state money" but all funds that come into

3. Long's letter stated, in part:

As you know, two deposit accounts were opened by the Inaugural Committee. Funds received were carefully segregated so that all funds received from corporate sources were deposited into one of the accounts ("the Inaugural Expense Account") and funds received from other than corporate sources were deposited into the other account ("the Ticket Sales Account").

Briefly, a total of $102,175.00 was deposited into the Ticket Sales Account, and a total of $70,003.85 (including $10,000.00 advanced from me and $12,000.00 from the Ticket Sales Account) was deposited into the Inaugural Expense Account. The funds deposited into the Inaugural Expense Account were totally expended to pay the costs of the Inaugural ceremonies and events (I was reimbursed for the $10,000.00 advanced), and a balance of $90,524.00 remains in the Ticket Sales Account.

Members of the Mecham campaign committee were understandably anxious to apply the remaining balance of the Ticket Sales Account to unpaid campaign expenses. It was recognized, however, that the restrictions of the Laws in Arizona relating to campaign contributions and expenses (Article 1, Chapter 6, Title 16, Arizona Revised Statutes), particularly as modified by Proposition 200 which was approved by the voters on November 4, 1986, raised substantial legal questions of first impression as to the propriety of such an application.

. . . .

In order to avoid any risk of an unintentional violation of the law (or even an appearance thereof), or incurring the time and expense which would be necessary to obtain a judicial determination of the question, we have determined that the funds remaining in the Ticket Sales Account should not be applied to unpaid campaign expenses. Instead, *we believe that the entire balance remaining in the Ticket Sales Account should be held in a separately maintained account and expended, at the Governor's discretion, solely for the purposes of promoting the interests of the state, or to promote and encourage citizen public service to the state, and comparable such purposes within the purview, and pursuant to the provisions and the spirit, of A.R.S. § 41–1105.*

*Accordingly, as has been publicly announced and reported, all funds remaining in the Ticket Sales Account (the Inaugural Expense Account has a zero balance) have been turned over to the office of the Governor of Arizona, to be held and expended as stated above.*

(Footnote omitted; emphasis added.)

the possession of public officers in their official capacity "irrespective of the source." *See* A.R.S. § 35–212, as amended by 1983 Ariz.Sess.Laws, ch. 97, § 1; *see also* Notes of the Committees on the Judiciary and Government Operations. "Public money" clearly includes private funds held by the Governor pursuant to A.R.S. section 41–1105. Thus, as Governor, Mecham was authorized by A.R.S. section 41–1105 to accept and expend private funds for certain limited purposes. When he expended such funds for purposes not authorized by A.R.S. section 41–1105, he misused "public money" and was subject to the remedies in A.R.S. section 35–212. We conclude that section 41–1105 is not rendered meaningless by the application of sections 35–212 and –302.

The legislature appropriately rejected ownership as the test for determining whether funds paid to a public officer are "public money." When money, public or private, is paid into the hands of a public officer acting in an official capacity, it is paid to that particular individual for only one reason—because he or she is cloaked with authority of public office. In some circumstances, such as money paid for fines, the funds are not owned by the State until they are deposited in the State treasury.[4] In other cases, the State will never become the owner of funds held by a public officer in an official capacity. For example, public fiduciaries sometimes hold private funds in their official capacities. Because it is the public office that generates these funds, rather than the individual to whom the funds are paid, the legislature has wisely said that all such funds, regardless of the source, are "public money." *See* A.R.S. § 35–302.

### 2. The Mechams' Evidence of The Committee's Intent

■ During the impeachment hearings, Long testified that the Committee's intent "was not to make these monies public monies." The Mechams argue that this creat-

ed an issue that precluded the grant of summary judgment. We disagree.

First, the interpretation of the compromise agreement was a question of law for the trial court unless the agreement was ambiguous. *Hadley v. Southwest Properties, Inc.*, 116 Ariz. 503, 570 P.2d 190 (1977); *Aritex Land Co. v. Baker*, 14 Ariz. App. 266, 274, 482 P.2d 875, 883 (1971) ("[W]hen the parties to a pending suit compromise the cause of action, *and the terms of the compromise are complied with* the parties are bound by the agreement...."). The compromise agreement was not ambiguous. Long agreed on behalf of the Committee that the Governor's office would hold and expend the funds "within the purview, and pursuant to the provisions and the spirit, of A.R.S. § 41–1105."

Second, even if the compromise agreement was ambiguous, the undisclosed intent of Long was not admissible evidence. *Helena Chemical Co. v. Coury Bros. Ranches*, 126 Ariz. 448, 453, 616 P.2d 908, 913 (App.1980) (a contract is construed in accordance with the intention of parties as judged by objective standards and not by their secret intentions or motives).

Third, Long's testimony about the legal effect of the compromise agreement is not admissible evidence. *Rio Grande Oil Co. v. Pankey*, 50 Ariz. 529, 73 P.2d 707 (1937) (legal effect of a contract is a question of law for the court); *Chess v. Pima County*, 126 Ariz. 233, 235, 613 P.2d 1289, 1291 (App.1980) (conclusory affidavit did not comply with rule governing affidavits submitted in support of motion for summary judgment).

Finally, the only relevant intent is the intent of the legislature. The funds transferred to the office of the Governor pursuant to A.R.S. section 41–1105 are "public money" because the legislature has said so. Long's intent could not affect the characterization of the funds. He conceded at the impeachment hearings that "if there's some ramification of the law that I don't

---

**4.** A.R.S. § 35–321(6) provides in part as follows: "State monies" means all monies in the treasury of this state or coming lawfully into the possession or custody of the state treasurer.

know about that automatically made them public funds, so be it, I'm wrong."

The Mechams also rely upon the impeachment hearing testimony of Downey. She testified that it was the "understanding of everybody there" that when the Committee delivered the Mecham Inaugural Fund to the Governor's office, Governor Mecham was then the recipient of everything. We reject this testimony for the same reasons we reject Long's testimony: it was incompetent evidence that did not create an issue of material fact. *Jabczenski v. Southern Pac. Memorial Hosp.*, 119 Ariz. 15, 18–19, 579 P.2d 53, 56–57 (App. 1978) (in summary judgment court cannot consider affidavit based on inadmissible evidence).

### 3. Use of The Protocol Fund For Private Expenses

■ The Mechams contend that because Governor Mecham made personal expenditures from the Protocol Fund,[5] the Fund could not be "public money." According to the settlement agreement, however, Governor Mecham could use the money in the Protocol Fund only for the limited purposes specified in A.R.S. section 41–1105. His compliance or noncompliance with that statute does not determine whether the Protocol Fund is "public money." The funds became "public money" when the Governor accepted them in his official capacity.

### 4. The Letter From Governor Mofford And Attorney General Corbin

The Mechams point out that Governor Mofford and Attorney General Corbin, by letter dated August 5, 1988, proposed that Governor Mecham either return the money in the Protocol Fund to the contributors or donate the funds to an agreed-upon state program for the benefit of children. The Mechams argue that "this is dispositive proof that the funds were not public." The Mechams, however, did not rely upon the

letter proposal signed by Governor Mofford and the Attorney General in opposition to the State's motion for summary judgment. They cannot raise this issue for the first time on appeal. *Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 282, 736 P.2d 13, 16 (App.1987).

### 5. The Intent of The Contributors to The Inaugural Ball Fund

■ The Mechams next argue the Protocol Fund was private money because the contributors to the inaugural proceedings intended these funds be used to pay for the Inaugural Ball and campaign expenses. However, when the Committee chairman transferred the donated funds to the Governor's office in compromise of a threatened lawsuit, and Governor Mecham accepted and held the funds in his official capacity, they became "public money." This is true regardless of the contributors' intent.

Accordingly, we do not reach the Mechams' argument that the Committee held the funds in trust for the use of the Committee and for Mecham in his private capacity.

## D. THE STATUTORY CIVIL PENALTY

The Mechams make essentially three arguments against the assessment of a twenty percent civil penalty. First, they contend the imposition of the penalty was unlawful because the Protocol Fund was not "public money." Because we have already held that the Protocol Fund is "public money," this argument has no merit.

■ Second, the Mechams assert that it is "fundamentally unfair" to impose the penalty because the money in the Protocol Fund was not "illegally paid." We disagree. It was undisputed that Governor Mecham transferred the monies in the Protocol Fund to his personal account. This was an "illegal payment of public monies" and the attorney general was entitled to

---

**5.** Governor Mecham charged the fund for his wife's trip to the Orient and for the cost of

bartenders, flowers, flags, and food at a legislative luncheon.

recover a twenty percent penalty together with interest, attorney's fees, and costs. *See* A.R.S. § 35–212.

Third, Mechams argue that the penalty violates due process because it was imposed pursuant to A.R.S. section 16–905 (Proposition 200) which is void for vagueness. Again, the Mechams misunderstand the issue. Whether A.R.S. section 16–905 is or is not void is beside the point. The Committee compromised a disputed claim by transferring its funds to the office of the Governor. The money in the Protocol Fund became "public money" because it was held by the Governor in his official capacity; the twenty percent penalty was assessed pursuant to A.R.S. section 35–212 and not A.R.S. section 16–905.

## E. ATTORNEY'S FEES

Finally, the Mechams contend that the trial court abused its discretion when it awarded "excessive and inappropriate" attorney fees. We hold that the evidence in the record sufficiently supports the reasonableness of the State's $19,112 fee for the action below. Furthermore, a reasonable fee in a State action under A.R.S. section 35–212(A) is the prevailing reasonable hourly rate for similar services in the community. The trial court did not abuse its discretion.

Arizona Revised Statutes section 35–212(A) clearly permits the attorney general to recover "reasonable attorney fees." The relevant part of the statute in question provides that the attorney general has discretion to:

> bring an action in the name of the state to enjoin the illegal payment of public monies ... or if the monies have been paid, to recover such monies plus twenty per cent of such amount together with interest and costs, including reasonable attorney fees....

A.R.S. § 35–212(A).

The plain language of the statute permits the State's fee award. "[W]hen the language is clear and unequivocal, it is determinative of the statute's construc-

tion." *Janson v. Christensen,* 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991).

The Mechams argue that the fee award "runs contrary to the basic rationale of the seminal decision" in *Schweiger v. China Doll Restaurant, Inc.,* 138 Ariz. 183, 673 P.2d 927 (App.1983). They assert that the fee award of $125 per hour "grossly inflated" the rate for public sector attorneys. Aside from citing *Schweiger,* the Mechams do not suggest how the case supports their assertion. We reject their argument.

*Schweiger* involved a dispute over the termination of a lease agreement. The lower court entered judgment for the landlord but denied the landlord's application for attorney's fees. This court affirmed. Relying on a provision in the lease contract, the landlord then made an application for attorney's fees on appeal. The lease stated that the landlord could recover from the tenant reasonable attorney's fees for any legal proceeding in which the landlord prevailed. 138 Ariz. at 186, 673 P.2d at 930.

The *Schweiger* court distinguished the measure of attorney's fee awards in public rights litigation from litigation involving fee-paying clients. In cases involving the latter, "the rate charged ... is the best indication of what is reasonable under the circumstances of the particular case." 138 Ariz. at 187–88, 673 P.2d at 931–32. The application for fees should set out the agreed hourly billing rate so that the opposing party can challenge the reasonableness of that fee. 138 Ariz. at 188, 673 P.2d at 932. In public rights litigation, however, the fee is measured by the reasonable hourly rate prevailing in the community for similar work. 138 Ariz. at 187, 673 P.2d at 931; *see also Arizona v. Maricopa County Medical Soc'y,* 578 F.Supp. 1262, 1271 (D.Ariz.1984) (market rates approved for assistant attorney general).

In *Lacer v. Navajo County,* 141 Ariz. 392, 687 P.2d 400 (App.1984), we rejected the reasonable-hourly rate standard for public sector attorneys. The statute pursu-

ant to which the attorney's fees were awarded in *Lacer*, however, differs from the statute involved here. In this case, the Mechams are liable for the State's reasonable attorney's fees pursuant to A.R.S. section 35–212 and those fees are not limited to the amount paid or agreed to be paid, in contrast to fees awarded under A.R.S. section 12–341.01(A).

## III. CONCLUSION

We conclude that the Committee had authority to compromise the threatened litigation for alleged violations of election laws. Pursuant to the settlement, the Committee transferred the inaugural ball ticket proceeds to the Governor's office Protocol Fund. Because Governor Mecham held those funds in his official capacity as Governor, the transferred funds constituted public money.

We also conclude that the trial court properly awarded reasonable attorney's fees and costs to the State under A.R.S. section 35–212(A). In addition, the State requested its costs and reasonable attorney's fees on appeal under A.R.S. section 35–212(A). We hold that it is entitled to such recovery and direct it to file an application pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure.

For the reasons stated above, we affirm the lower court's order denying the Mechams' motion to vacate judgment.

GRANT, P.J., and LANKFORD, J., concur.