IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO
_____

JANE DOE I, JANE DOE II, AND JOHN DOE,
BY AND THROUGH CONSERVATOR, FLEMING AND CURTI, PLC,
*Plaintiffs/Appellants*,

*v.*

LENZNER MEDICAL SERVICES, LLC,
AN ARIZONA LIMITED LIABILITY COMPANY; AND
DR. JOHN HERROD AND SHERRIE FARNSWORTH HERROD,
INDIVIDUALLY AND AS A JOINTLY MARRIED COUPLE,
*Defendants/Appellees.*

No. 2 CA-CV 2024-0030
Filed May 5, 2025
_____

Appeal from the Superior Court in Cochise County
No. S0200CV202000599
The Honorable Timothy B. Dickerson, Judge

**AFFIRMED**
_____

COUNSEL

Cadigan Law Firm PLLC, Tucson
By Lynne M. Cadigan

and

Manly, Stewart & Finaldi, Irvine, California
By John C. Manly

and

John Trebon P.C., Flagstaff
By John J. Trebon
*Counsel for Appellants*

Holden & Armer P.C., Phoenix
By DeeDee Armer Holden and Michael J. Ryan
*Counsel for Appellees*

---

**OPINION**

---

Judge Vásquez authored the opinion of the Court, in which Judge Sklar concurred, Judge Vásquez specially concurred, and Presiding Judge Eckerstrom dissented.

---

V Á S Q U E Z, Judge:

**¶1**    Jane Doe I, Jane Doe II, and John Doe (collectively, "the Does") appeal the superior court's grant of summary judgment in favor of Dr. John Herrod, Sherrie Farnsworth Herrod, and Lenzner Medical Services, LLC (collectively, "the Medical Defendants").[1]  Because the Does have not shown the court erred in concluding that the Medical Defendants had no duty to report child abuse under Arizona's mandatory reporting statute, we affirm.

**Factual and Procedural Background**

**¶2**    We view the facts in the light most favorable to the Does, the party opposing summary judgment, and draw all reasonable inferences arising from the evidence in their favor.  *See Modular Mining Sys., Inc. v. Jigsaw Techs., Inc.*, 221 Ariz. 515, ¶ 2 (App. 2009).  The undisputed relevant and material facts are as follows:

**¶3**    Paul and Leizza Adams were members of the Church of Jesus Christ of Latter-Day Saints ("LDS Church").  The Adamses joined the Bisbee Ward of the LDS Church in 2009.  Between 2006 and 2015, Paul and Leizza had six children, three of whom are the Does in this action.

---

[1]Dr. John Herrod was the founder and sole managing member of Lenzner Medical.  Dr. Herrod's wife, Sherrie Farnsworth Herrod, is a named defendant for community property liability purposes, but she is otherwise not involved in the case.

¶4          Dr. John Herrod is a licensed internal medicine physician. He formed Lenzner Medical around 2008 and maintained the practice until his retirement in 2019. Herrod is also a member of the LDS Church, and, from 2004 to 2012, he served as the lay bishop of the LDS Church's Bisbee Ward. While serving as bishop, Herrod continued practicing medicine.

¶5          Dr. Herrod began treating Leizza as a patient sometime after the Adamses moved to Bisbee in 2009, and he remained her primary physician through at least 2018. Paul was also a patient of Lenzner Medical, having been treated on at least a few occasions by a nurse practitioner who worked at the clinic. Dr. Herrod occasionally provided medical treatment to the Does.[2]

¶6          In November 2011, Paul confessed to Herrod, in Herrod's capacity as bishop, that he had sexually abused Jane Doe I. Herrod had Leizza join them and instructed Paul to repeat his confession to her. Herrod began counseling both Paul and Leizza, recommending either Paul turn himself in or Leizza report Paul to the authorities. Given his religious vow of confidentiality, Herrod did not report Paul's abuse to the authorities. When Herrod's term as bishop ended less than a year later,[3] he continued as the family's doctor.

¶7          Paul continued to sexually abuse Jane Doe I, Jane Doe II, and John Doe until he was arrested by federal authorities in February 2017. In May 2017, a grand jury indicted Paul on multiple counts of felony child sexual abuse and exploitation. Seven months later, Paul committed suicide in his prison cell. Leizza pled guilty to two counts of child abuse, and, in August 2018, she was sentenced to 2.5 years in prison, followed by four years' probation.

---

[2]The parties dispute whether Dr. Herrod was the Does' doctor, but, for purposes of the motion for summary judgment, the superior court "assum[ed] that Herrod provided medical treatment to Jane Doe I and her siblings on some occasions between the years of 2010 and February 2017." We do the same.

[3]Under LDS Church doctrine, members are "called" to serve as lay bishops for a fixed period of time and are "released" once their term is over.

¶8 The Does filed this civil action in November 2020,[4] and, in their first amended complaint, they asserted the following claims against the Medical Defendants: (1) negligence; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) breach of fiduciary duty; (5) medical malpractice/medical negligence; (6) ratification; and (7) civil conspiracy. They additionally asserted a negligent hiring, retention, and supervision claim against Lenzner Medical, and sought punitive damages.[5] Herrod is a defendant in two capacities—as one of the Medical Defendants for his role as a doctor, and as one of the other church defendants in his clergy capacity. This appeal concerns only Herrod's capacity as a Medical Defendant.

¶9 In May 2022, the Medical Defendants moved for summary judgment. In December 2023, after briefing and oral argument, the superior court issued its under advisement ruling, granting summary judgment in favor of the Medical Defendants and dismissing all claims with prejudice. The court entered a final judgment pursuant to Rule 54(c), Ariz. R. Civ. P., and this appeal followed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1) and 12-2101(A)(1).

## Discussion

¶10 The Does argue on appeal, as they did below, that the superior court erred in granting summary judgment in favor of the Medical Defendants because, under A.R.S. § 13-3620, Dr. Herrod had "an independent duty to report" the abuse committed against them by their father, Paul, and the neglect committed by their mother, Leizza. We review a grant of summary judgment de novo. *Phoenix Baptist Hosp. & Med. Ctr., Inc. v. Aiken*, 179 Ariz. 289, 292 (App. 1994). To prevail on a motion for summary judgment, the moving party must show "that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a). Although we view the evidence

---

[4]Fleming and Curti, PLC brought this action as conservator for and on behalf of the Does who were minors at the time of filing.

[5]The Does initially sued the LDS Church, the Medical Defendants, and various individual defendants in the same action. It appears that for the purposes of litigation below, the claims were later separated for each group of defendants. Although the complaint in our record lists all named defendants, this appeal is concerned only with the claims against the Medical Defendants.

and reasonable inferences in favor of the nonmoving party, summary judgment should be granted when the facts produced in response to a summary judgment motion have "so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme Sch. v. Reeves*, 166 Ariz. 301, 309-10 & 309 (1990); *see* Ariz. R. Civ. P. 56(e) (adverse party's response must "set forth specific facts showing a genuine issue for trial").

¶11        The Medical Defendants' motion for summary judgment addressed the Does' medical malpractice claims, which are primarily directed at Dr. Herrod. "In all negligence actions, including medical malpractice, 'the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damages.'" *Windhurst v. Ariz. Dep't of Corr.*, 256 Ariz. 186, ¶ 14 (2023) (quoting *Seisinger v. Siebel*, 220 Ariz. 85, ¶ 32 (2009)). Thus, as a threshold matter, the Does "bear[] the burden of proving the existence of a duty." *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, ¶ 2 (2018). The existence of a duty is a question of law that we review de novo. *Ritchie v. Krasner*, 221 Ariz. 288, ¶ 11 (App. 2009).

¶12        Dr. Herrod was a practicing physician before and after he learned of the abuse and neglect. He also served as a lay bishop for the LDS church and, in that capacity, was a "member of the clergy" during the relevant period. *See* A.R.S. § 13-3620(A)(2). Both physicians and clergy are identified as persons to whom the mandatory reporting statute applies. § 13-3620(A)(1), (2). Arizona's mandatory reporting statute, § 13-3620(A), provides, in part, as follows:

> Any person who reasonably believes that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect that appears to have been inflicted on the minor by other than accidental means . . . shall immediately report or cause reports to be made of this information to a peace officer . . . . For the purposes of this subsection, "person" means:
>
> (1) Any physician . . . who develops the reasonable belief in the course of treating a patient.
>
> (2) Any . . . member of the clergy.

**¶13**        In this case, the parties agree that § 13-3620(A)(1) governs the duty that Dr. Herrod had to report the abuse and neglect of the Does in his capacity as a physician.  Indeed, at the hearing on the Medical Defendants' motion for summary judgment, the Does stated that "the fundamental basis of the duty" to report arises from the statute.  And in their opening brief, they state that "if Dr. Herrod had a duty to report under A.R.S. § 13-3620, then the failure to do so breached the applicable standard of care owed to the children."

**¶14**        But the parties disagree about whether that duty is impacted by Herrod's statutory duty to report as a member of the clergy and the scope of his duty to report as a physician.  There are two distinct reporting limitations under the statute that apply to Herrod in his dual role as a clergy member and physician.  *See* § 13-3620(A), (1).  First, the statute provides a reporting exception for clergy who learn of child abuse or neglect in the context of a confession or confidential communication, while serving in that capacity.  § 13-3620(A).  Second, the statute provides that a physician is obligated to report only if he develops a reasonable belief of child abuse or neglect "in the course of treating a patient."  § 13-3620(A)(1).

**¶15**        Much of the argument in the superior court focused on the interplay between the statutory provisions for clergy and physicians.  Both below and on appeal, the parties refer to Herrod as wearing "two hats" in his dual role as clergy and doctor.  The Medical Defendants argue that the "single spiritual confessional communication by [Paul] Adams in November 2011 to *Bishop* Herrod" was privileged and cannot be used to hold Dr. Herrod liable for failing to "subsequently report the abuse as a physician pursuant to A.R.S. § 13-3620(A)(1)."  The Does in contrast, contend that Herrod "could not dismiss abuse and neglect simply because he wore two metaphorical hats as a medical doctor and as a lay bishop." The superior court concluded that Paul's confession and the subsequent counseling sessions Herrod held with Paul and Leizza were privileged and confidential and were therefore exempted from Herrod's reporting duty as a member of the clergy, under the express terms of the statute.  *See* § 13-3620(A).  The issue of Herrod's duty to report as a clergy member is the subject of a different appeal pending in this court, and we do not discuss it here.  Instead, we turn to Herrod's duty as a physician.

**¶16**        As a general matter, "There is no common law duty to control the conduct of a third person so as to prevent harm from befalling another." *Collette v. Tolleson Unified Sch. Dist., No. 214*, 203 Ariz. 359, ¶ 13 (App. 2002); *see also Dinsmoor v. City of Phoenix*, 251 Ariz. 370, ¶ 15 (2021) ("People do not

generally have a duty to protect others from harm."). Under Arizona law, however, certain "special relationships" can create a duty in regard to "the actions of another." *Gipson v. Kasey*, 214 Ariz. 141, ¶¶ 18-19 (2007). These relationships may be "recognized by the common law" or may be "created by public policy," which is primarily drawn from statutes. *Quiroz*, 243 Ariz. 560, ¶ 2.

¶17        On appeal, the Does expressly distinguish "[t]he duty to report under the Arizona mandatory reporting statute" from the common law "affirmative duty to protect arising from other 'special relationships.'" They expressly assert that the duty in this case is limited to Herrod's "duty to report under A.R.S. § 13-3620," and "not that he had a duty to investigate, intervene, and stop the abuse," as discussed by our supreme court in *Dinsmoor*. The Does nevertheless suggest that the duty under the reporting statute required Herrod to report what he knew about the abuse solely because he treated Leizza and the children, regardless of where or how he learned of it.

¶18        According to the Does, the duty to report under § 13-3620(A) and Dr. Herrod's failure to do so "establishes medical malpractice under A.R.S. § 12-563." To support this position, the Does rely on the opinion of their medical expert, Dr. Berg. The Does contend "Dr. Berg[] stated that, based on a clear medical and ethical standard of care, Dr. Herrod had a duty to report the abuse of the children and the neglect by their mother." They cite an American Medical Association (AMA) ethical opinion to support the expert's opinion, and they argue Herrod's failure to report "breached the applicable standard of care owed to the children."

¶19        But as the superior court correctly concluded, and as our supreme court has explained, Arizona courts will not base the existence of a duty on "the medical profession's ethical standards because such a notion conflates the existence of a duty with the standard of care." *Stanley v. McCarver*, 208 Ariz. 219, ¶ 17 (2004). "The existence of a duty of care is a distinct issue from whether the standard of care has been met in a particular case." *Boisson v. Ariz. Bd. of Regents*, 236 Ariz. 619, ¶ 5 (App. 2015) (quoting *Gipson*, 214 Ariz. 141, ¶ 10). And whether a duty exists is a question of law for the court to decide, not experts. *Badia v. City of Casa Grande*, 195 Ariz. 349, ¶ 17 (App. 1999). Notably, at the hearing on the Medical Defendants' motion for summary judgment, the Does acknowledged that the "AMA ethics opinion is evidence of the standard of care."

¶20        "In Arizona, our primary source for identifying a duty based on public policy is our state statutes." *Quiroz*, 243 Ariz. 560, ¶ 18. This is

because "[t]he declaration of 'public policy' is primarily a legislative function." *Ray v. Tucson Med. Ctr.*, 72 Ariz. 22, 35 (1951). In this case, as the Does concede, any duty Dr. Herrod had to report the abuse of the Does is governed by § 13-3620(A)(1). That statute defines both the duty to report and its scope. *See Gipson*, 214 Ariz. 141, ¶¶ 24-29 (statute can both create and limit legal duty); *Alhambra Sch. Dist. v. Superior Court*, 165 Ariz. 38, 42 (1990) ("[A] duty of care may also be created by statute."). Under the express language of the statute, Dr. Herrod had a duty to report only if he developed a reasonable belief of child abuse or neglect "in the course of treating a patient." § 13-3620(A)(1).

**¶21** The Does "agree that the language relating to 'in the course of treating a patient' applies to Dr. Herrod." They argue, however, that Herrod "could not dismiss abuse and neglect simply because he wore two metaphorical hats as a medical doctor and as a lay bishop." They further assert, quoting a case decided by the Colorado Court of Appeals, that the duty to report "applies irrespective of the circumstances in which the reporter learns of or suspects abuse or neglect." *Heotis v. Colo. State Bd. of Educ.*, 457 P.3d 691, ¶ 35 (Colo. App. 2019). That case does not support the Does' argument. In *Heotis*, the court noted that the statute in question did not "limit the reporting duty only to child abuse or neglect that the teacher learned about" in her employment. *Id.* ¶ 36. The court noted that, if the duty to report was meant to be limited, the Colorado legislature could have included "limiting language, such as 'during his or her professional duties,'" as it had in regard to commercial film processors. *Id.* That is exactly what our legislature has done by limiting the scope of a physician's duty to report abuse or neglect to that knowledge developed "in the course of treating a patient." § 13-3620(A)(1).

**¶22** The Does nevertheless maintain that "[t]he 'two hat' theory is contrary to public policy" because it "encourages deliberate ignorance on the part of a physician and acts as a disincentive to be inquisitive with patients." We have recognized the "strong policy reasons for requiring professionals who work with children to report instances of suspected child abuse." *L.A.R. v. Ludwig*, 170 Ariz. 24, 27 (App. 1991). But the scope of Herrod's duty under the statute, as we have stated, is limited to circumstances in which a doctor "develops the reasonable belief [that a minor is or has been the victim of . . . abuse] in the course of treating a patient." § 13-3620(A)(1). Like the superior court, we must therefore consider "case-specific facts in the duty inquiry" involving the doctor-patient special relationship to determine "*when* and *where* the alleged risk of harm arose—within or outside the scope of the special

relationship." *Perez v. Circle K Convenience Stores, Inc.*, ___ Ariz. ___, ¶ 15, 564 P.3d 623, 628 (2025). "[A] duty based on special relationships . . . applies only to risks that arise within the scope of the relationship, and the scope of such relationships is [generally] bounded by geography and time." *Id.* ¶ 12, 564 P.3d at 628 (first alteration added, second alteration in *Perez*) (quoting *Dinsmoor*, 251 Ariz. 370, ¶ 15).

¶23 We agree with the Does that "reasonable [belief]" as used in the reporting statute is a low standard, which may be met "if there are any facts from which one could reasonably conclude that a child had been abused." *L.A.R.*, 170 Ariz. at 27. But in this case, there is no question that Dr. Herrod was aware that Jane Doe I had been abused. Instead, the issue is whether he had received such information "in the course of treating a patient." *See* § 13-3620(A)(1). As we explain, the Does failed to present evidence demonstrating the existence of a genuine dispute as to that fact. *See State v. Mecham*, 173 Ariz. 474, 478 (App. 1992).

¶24 In its ruling on the motion for summary judgment, the superior court determined, "There is no evidence that Herrod had reason to suspect child abuse based on any information he gained from providing treatment to" the Does and their parents after the confession. Indeed, during argument on the motion in the superior court, the Does conceded that "there was no further discussion about abuse" with Herrod as a doctor. They argued instead that Herrod could not be allowed to "put out of his mind that his child patient was being abused while he was that patient's doctor."

¶25 Likewise, on appeal, the Does argue that Herrod "harbored a 'reasonable belief' of abuse or neglect." Therefore, they maintain, he "could not dismiss abuse and neglect simply because" he was both a doctor and a lay bishop. Allowing him to do so violates the duty and standard of care that they contend are created by § 13-3620(A)(1). To support this argument, they rely on *L.A. v. New Jersey Division of Youth & Family Services*, 89 A.3d 553, 556 (2014), a New Jersey case that has no application here. In that case, a child was treated in an emergency room after ingesting cologne. *Id.* at 555. The issue was whether the emergency room physician, who did not report the matter, had "reasonable cause . . . to believe that child abuse ha[d] occurred," creating an obligation to report under New Jersey's reporting statute. *Id.* at 556. First, the New Jersey and Arizona statutes are different. *Compare* N.J. STAT. ANN. § 9:6-8.10 (West 2019), *with* § 13-3620(A)(1). The New Jersey statute does not base a physician's duty to report on a reasonable belief of child abuse or neglect developed "in the

course of treating a patient." § 13-3620(A)(1); *see* § 9:6-8.10. Second, unlike in this case, the physician treated the child for the very incident that allegedly amounted to abuse. *L.A.*, 89 A.3d at 566. As we have explained, Arizona's statute requires reporting by a physician only when he or she develops knowledge of abuse in the course of treatment. Outside of the duty created by that special relationship rooted in statute, Herrod owed no duty to prevent harm by another, in this case the children's father.

¶26        The Does, however, also contend there were "non-privileged" conversations between Herrod and Leizza about different or ongoing instances of child sexual abuse, separate from the act that was disclosed during Paul's confession. Because the Does bear the burden of proof at trial, in opposing summary judgment, they were required to present admissible evidence creating genuine issues of material fact as to each element of their claim. *See Martin v. Schroeder*, 209 Ariz. 531, ¶ 12 (App. 2005). Many of the Does' claims, as we explain below, are conclusory and not supported with citations to the record. *See* Ariz. R. Civ. App. P. 13(a)(7) (argument section of opening brief must contain "appropriate references to the portions of the record on which the appellant relies"); *see also Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, ¶ 42 (App. 2015) (non-movants' conclusory statements, "unsupported by any documentary evidence," were speculative); *Florez v. Sargeant*, 185 Ariz. 521, 526 (1996) (self-serving assertions lacking factual support are insufficient to defeat summary judgment).

¶27        Further, where the Does do provide record citations, there is no evidence to support their claim that Dr. Herrod received "non-privileged" information from Leizza during the course of treating a patient. *See Kelly v. NationsBanc Mortg. Corp.*, 199 Ariz. 284, ¶ 14 (App. 2000) ("When the party moving for summary judgment makes a prima facie showing that no genuine issue of material fact exists, the burden shifts to the opposing party to produce sufficient competent evidence to show that an issue exists."). Significantly, at oral argument on the motion for summary judgment below, the superior court questioned the Does about whether Dr. Herrod had learned of abuse apart from the initial confession. The court stated that "as far as the doctor visits, whether they were at the house, or whether they were in the clinic, I don't see anything in there where some new information came to him that should have . . . created a reasonable suspicion of child abuse." The Does responded: "[I]n terms of what was said in the doctor's office, there was no further discussion about abuse."

¶28        Despite this concession in the superior court, the Does nevertheless assert that Dr. Herrod "learned of the neglect and abuse from Leizza Adams, the wife of the perpetrator . . . which was not covered by the priest-penitent confession privilege." To support this claim, the Does rely on a transcript of a recorded interview at Herrod's home in 2018, between Herrod and a federal law enforcement agent, after Paul's arrest and subsequent suicide. The Does do not refer to any specific statements made during the interview that even remotely relate to their claim. In any event, the substance of the interview appears to relate largely to the clergy-penitent confession and the subsequent counseling sessions in Herrod's capacity as a bishop, not about information he may have received as a physician during the course of treating a patient. The statements therefore do not constitute evidence that raises a genuine issue of fact. *See* Ariz. R. Civ. P. 56(c); *United Bank of Ariz. v. Allyn*, 167 Ariz. 191, 196 (App. 1991).

¶29        The Does also allege that "Bishop Herrod spoke to Leizza Adams several times encouraging her to turn Paul in to the police." They assert, "As a result, it is clear that Dr. Herrod had knowledge of sex abuse outside of the confession of Paul Adams." For support, they cite portions of Herrod's deposition testimony concerning his conversations with Paul and Leizza about "turning themselves in."[6] But again, those conversations relate to the original confession and counseling, which are the subject of a different appeal. The Does also refer to Herrod's comment that he had "discussed [Jane Doe I's] well-being" with Leizza, but he did not "remember exactly what [they] discussed." This statement contains no mention of child sexual abuse or neglect and does not support a reasonable inference that Herrod had received information of abuse or neglect in his role as a doctor. In sum, the statements are conclusory allegations that do not "set forth specific facts showing a genuine issue for trial." Ariz. R. Civ. P. 56(e); *see Mecham*, 173 Ariz. at 478 ("A party cannot rely solely on unsupported contentions that a dispute exists to create a factual issue that would defeat summary judgment.").

---

[6]Herrod was deposed on two occasions by the Does, each for a different purpose. The first deposition was taken in Herrod's personal capacity, for the claims asserted against him as a bishop of the LDS Church. In the second deposition, Herrod testified as the designated Rule 30(b)(6), Ariz. R. Civ. P., witness for Lenzner Medical, in relation to the Does' medical malpractice claims.

¶30 In their reply brief, the Does "agree that the language [in § 13-3620(A)(1),] relating to 'in the course of treating a patient' applies to Dr. Herrod." But they contend that "he discovered the inability of Leizza Adams to protect her children as her medical doctor in the course of treating her as a patient." They essentially argue that Leizza neglected the children by not reporting Paul's sexual abuse, and Herrod was aware of her failure to do so. Therefore, they maintain Herrod had "learned more than enough as a physician that Leizza Adams was guilty of child abuse and neglect."[7] But again, this argument is flawed because it relies on the information Herrod learned from Paul's confession. In the absence of Paul's confession to the act of sexual abuse against Jane Doe I in 2011, Herrod would have no reason to believe Leizza needed to protect her children from anything.

¶31 Moreover, the Does' argument that "Dr. Herrod knew, as Leizza's physician, that Leizza Adams was incapable of protecting her children from her predatory husband" is based solely on their contention that Herrod believed she "suffered from Battered Woman Syndrome." This claim is based on a comment Herrod made during his recorded interview with the federal agent in 2018, after Paul's arrest and subsequent suicide. And aside from this comment, the Does do not point to any evidence in the record that Herrod had diagnosed Leizza with Battered Woman Syndrome, or that he was even qualified to do so, around the time Herrod had learned of the abuse.

---

[7]The record does not support this argument. During his deposition, Herrod was asked "what [he] did to assist Jane Doe I" after "learning that [she] had been abused by Paul Adams," and the following dialogue ensued:

Plaintiff's Counsel: How did you protect the children from further acts?

Herrod: I spoke with Leizza on many occasions, and she told me that the—that no further acts were occurring. We had agreed that he should be gone from the house as much as possible. And to my recollection, he took a job in Tucson. He was never to be home alone with the children. And I think that she communicated with the children frequently to make sure no—that the child, excuse me, Jane Doe I, that no further acts occurred.

This testimony supports Herrod's argument that he did not learn about any child abuse or neglect from Leizza, while he was treating her as a patient or otherwise.

¶32        Ultimately, the Does have not identified any evidence that Dr. Herrod learned about child abuse or neglect of the Does in his capacity as a physician, much less in the course of treating a patient. As the Medical Defendants point out, Jane Doe I and John Doe never stated that they had discussed their father's sexual abuse with Herrod. Both stated that they recall visiting Herrod's office, and Jane Doe I remembers Herrod coming to their house when they were sick. But neither statement amounts to evidence that would give rise to a reasonable belief of abuse. Several of Herrod's employees from Lenzner Medical stated they remembered the family being patients of the clinic, but none of the employees indicated there were any signs of child abuse. Herrod testified that he did not receive any information from Paul, Leizza, the Does, or anyone else that would have given him reason to believe abuse was occurring, in his professional capacity as a doctor, "in the course of treating a patient." *See* § 13-3620(A)(1).

**The Dissent**

¶33        Our dissenting colleague misstates the majority's position regarding the existence of a duty. Like the superior court, we accept as a given that Dr. Herrod treated the entire family, so that is not the open question the dissent makes it out to be. As such, there is also no question that there was a doctor-patient relationship between Herrod and the Does—a special relationship that gave rise to a general duty of care in the treatment of the children owed by Herrod. But the dissent raises issues that the Does neither argued below nor on appeal. Specifically, the Does do not argue that Herrod owed a separate common law duty based on the special relationship between physicians and patients. To the contrary, they argue "Dr. Herrod failed to 'report' under A.R.S. §13-3620(A)" and that that failure breached the standard of care. Consequently, the record in this case is devoid of any argument that Herrod breached a separate duty arising under common law or the medical malpractice statutes, and it is not for this court to address an argument the parties have not raised.[8] *See* Ariz. R. Civ. App. P. 13(a) (appellant's brief must contain statement of issues for review with contentions concerning each issue presented, supporting legal authority, appropriate references to record, and reasons for each contention); *Calnimptewa v. Flagstaff Police Dep't*, 200 Ariz. 567, ¶ 24 (App. 2001) (appellate opinions should not be read "as authority for matters [that are not] specifically presented and discussed"); *Childress Buick Co. v.*

---

[8]And for this reason, we cannot address which duty would govern, one existing under the common law, if any, or the statutory duty.

*O'Connell*, 198 Ariz. 454, ¶ 29 (App. 2000) (declining to decide appeals on issues parties "did not present and may well have intentionally decided not to present" is a "wise policy of judicial restraint").

**¶34**      Our dissenting colleague seems to suggest that a physician's duty to report suspected child abuse is synonymous with a physician's duty to "marshal information in their possession, pertinent to the patient's health, to protect them from that risk of harm."  Again, this is an argument not raised by the Does, either below or on appeal.  Indeed, they specifically assert that Dr. Herrod did not have a "duty to investigate, intervene, and stop the abuse."  To be sure, a physician's duty to protect his or her patient's health remains largely grounded in common law.  *See, e.g.*, *Roebuck v. Mayo Clinic*, 256 Ariz. 161, ¶ 18 (App. 2023) (recognizing cause of action for medical malpractice to be fundamental right and thereby protected against abrogation by Ariz. Const., art. 18, § 6 because it has "origins in the common law").  However, even were we to accept that the duty might encompass obligations to report suspected child abuse to the authorities, that reporting obligation is governed by the conditions set forth in § 13-3620.  Neither the parties nor the dissent cite to any cases establishing a common law duty to report child abuse, and we likewise are aware of none.  Thus, we disagree that our interpretation of § 13-3620 introduces "a limitation at odds with our civil statutes and common law."

**¶35**      We therefore also disagree with the dissent that the duty of care arising from the doctor-patient relationship, as a special relationship under the common law, is "the sole criteria for determining duty" and that the superior court thus erred in granting summary judgment.  Our supreme court has clarified that duties arising from a special relationship only apply to risks "within the scope of the relationship," which is "bounded by geography and time."  *Dinsmoor*, 251 Ariz. 370, ¶¶ 17-18 (quoting *Boisson*, 236 Ariz. 619, ¶ 10, and then *Monroe v. Basis Sch., Inc.*, 234 Ariz. 155, ¶ 6 (App. 2014)).  The Does themselves acknowledge this rule and attempt to distinguish it, as noted above.

**¶36**      In *Perez*, our supreme court explained that "[t]he purpose in examining case-specific facts in the duty inquiry involving a special relationship is determining *when* and *where* the alleged risk of harm arose—within or outside the scope of the special relationship."  ___ Ariz. ___, ¶ 15, 564 P.3d at 628.  The reporting statute expressly defines the when and where of the circumstances triggering a physician's duty to report.  It specifies that the duty exists only when he or she "develops the reasonable belief in the course of treating a patient."  § 13-3620(A)(1).  The facts cited by the

majority therefore have direct bearing on the existence and scope of Dr. Herrod's duty to report, not on whether he breached the standard of care, as the dissent maintains.[9] *See Perez*, ___ Ariz. ___, ¶ 20, 564 P.3d at 630 ("[S]ometimes certain antecedent facts must be considered in determining whether a duty exists—for instance, whether a statute applies to a circumstance to give rise to a duty . . . ."); *see also Gipson*, 214 Ariz. 141, ¶ 10 (duty is defined as legal obligation requiring defendant to conform to certain standard of conduct to protect others from unreasonable risk of harm while standard of care is defined as what defendant must do to satisfy duty).

¶37 Notably, the scope of a physician's duty to report under § 13-3620(A)(1), is consistent with Arizona's medical malpractice statutes, upon which the Does have based their related claims. Under A.R.S. § 12-561(2), a medical malpractice action is "an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions, or breach of contract *in the rendering of health care*." (Emphasis added.) Although Dr. Herrod was the family's doctor, the Does offered no evidence that he had received any information or observed anything in the course of treating a patient that would lead to a reasonable belief that the Does were victims of abuse or neglect. Specifically, there is no evidence that Herrod received any information about abuse or neglect at his medical office or at any other location at which he may have rendered healthcare. As we previously noted, the Does conceded this point and any duty to report the information he received in his capacity as bishop is the subject of a separate appeal.

¶38 The superior court correctly concluded that the only evidence presented by the Does may have established a standard of care, but it did not establish a duty to report, which as we explained above, is a question of law. We therefore agree with our dissenting colleague that the Does'

---

[9]To clarify, such inquiries that may fall under the standard of care would be, for example, whether the information received during the course of treating a patient amounts to a "reasonable belief" of child abuse; whether the actions taken by the physician were sufficient to constitute "report[ing] or caus[ing] reports to be made"; or whether the timing of the reporting amounted to being "immediate[]." In other words, what the physician "must do, or must not do . . . to satisfy the duty" to report child abuse. *See Gipson*, 214 Ariz. 141, ¶ 10 (quoting *Coburn v. City of Tucson*, 143 Ariz. 50, 52 (1984)).

expert opinion and ethical opinion of the AMA may have established a standard of care. The dissent acknowledges that Dr. Herrod's knowledge of abuse was gained "outside of the clinical setting" and therefore not "in the course of treating a patient." But our colleague incorrectly states this does not limit when a physician's duty to report arises. The statute defines a physician's reporting duty. And because we conclude no duty exists in this case—again, solely as it relates to a physician's reporting of child abuse—we need not decide other issues like standard of care. *See Beck v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 426, 429 (App. 1987).

**¶39** Last, we disagree with the dissent's position that § 13-3620 is a criminal statute that "describes only what steps physicians 'must do or must not do,' in the context of child abuse, to avoid criminal penalties."[10] None of the reported cases addressing § 13-3620 involve criminal prosecutions for the failure to report, and most importantly, those involving physicians and others covered by § 13-3620(A)(1) all treat the obligation to report as a question of duty and not as one of the standard of care. *See Avitia v. Crisis Preparation & Recovery Inc.*, 256 Ariz. 198 (2023) (addressing mental health professionals' statutory duty to report); *State v. Zeitner*, 246 Ariz. 161, ¶ 21 (2019) (noting instances where the legislature has mandated duty to disclose information otherwise protected by physician-patient privilege); *Johnson v. O'Connor*, 235 Ariz. 85, ¶ 29 (App. 2014) (psychologist-client privilege not applicable where mandatory reporting statute requires disclosure); *Ramsey v. Yavapai Fam. Advoc. Ctr.*, 225 Ariz. 132 (App. 2010) (discussing mental health and medical providers' mandatory duty to report); *Waters v. O'Connor*, 209 Ariz. 380, n.8 (App. 2004) (footnote discussing scope of clergy duty to disclose); *State v. Herrera*, 203 Ariz. 131, ¶¶ 9-17 (App. 2002) (addressing marital privilege in prosecution for abuse); *State v. Wilson*, 200 Ariz. 390, n.1 (App. 2001) (discussing statutory exceptions to physician-patient privilege); *State v. Escobar-Mendez*, 195 Ariz. 194, ¶¶ 16-17 (App. 1999) (whether duty to report under statute makes physician an agent of the state); *In re Timothy C.*, 194 Ariz. 159, ¶ 3 (App. 1998) (noting psychologist had duty to report evaluation of child for "sexual disorder" under statute); *State v. Superior Court*, 183 Ariz. 462 (App. 1995) (medical records relating to physician's treatment of alleged abuser not protected by privilege under statute); *Benton v. Superior Court*, 182 Ariz. 466,

---

[10]A criminal statute, despite being "silent on the issue of civil liability," can establish a civil duty if it is "designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred." *Gipson*, 214 Ariz. 141, ¶¶ 26-27.

469 (App. 1994) (statute cited in general discussion of physician's duty to disclose certain information); *Blazek v. Superior Court*, 177 Ariz. 535, 538-39 (App. 1994) (statute listed as example of exception to marital communication privilege); *L.A.R.*, 170 Ariz. 24 (counselor's reporting of abuse); *Church of Jesus Christ of Latter-Day Saints v. Superior Court*, 159 Ariz. 24 (App. 1988) (whether statute creates testimonial privilege for clergy independent of penitent's consent); *Samaritan Health Servs. v. City of Glendale*, 148 Ariz. 394, 397 (App. 1986) (collecting statutes regarding physicians' and others' duty to report); *State v. Salzman*, 139 Ariz. 521 (App. 1984) (addressing scope of marital privilege against testifying in prosecution for child molestation); *State v. Riffle*, 131 Ariz. 65, 66 (App. 1981) (noting hospital staff's reporting of suspected child abuse under statute).

**¶40**        In sum, to survive a motion for summary judgment, a plaintiff must produce admissible evidence from which a reasonable jury could find in his favor on each element. *See Orme Sch.*, 166 Ariz. at 309-10. This includes the existence of a duty. *Avitia*, 256 Ariz. 198, ¶ 26 ("The plaintiff bears the burden to establish that a duty exists."). Because the Does failed to show a genuine dispute as to whether Dr. Herrod had developed a reasonable belief of sexual abuse or neglect in his capacity as a physician that would have triggered his duty to report, the superior court did not err in granting summary judgment. *See Orme Sch.*, 166 Ariz. at 309-10.

### Disposition

**¶41**        For the foregoing reasons, we affirm the superior court's grant of summary judgment in favor of the Medical Defendants on all claims.

V Á S Q U E Z, Judge, specially concurring:

**¶42**        As the majority points out, the Does have not argued, either in the superior court or on appeal, that there is a separate common law duty to report or that the medical malpractice statutes establish one. Indeed, they have expressly stated that the duty to report at the center of this case is entirely governed by § 13-3620. It is therefore inappropriate for us to speculate about any common law duty, much less whether such a duty would supersede the statutory duty. Under the guise of a waiver analysis, the dissent nevertheless does exactly that. I write separately to address our dissenting colleague's position.

**¶43**        Even assuming the Does had established the existence of a common law duty to report, any such duty must give way to the statutory duty to the extent the two differ. *See* A.R.S. § 1-201 (common law governs

court decisions only to the extent it is consistent with the laws of this state); *see Quiroz*, 243 Ariz. 560, ¶ 2 ("In the absence of such legislative guidance, duty may be based on the common law.").  Under § 13-3620, the legislature has adopted a duty to report abuse, physical injury, and neglect of children committed by third-parties for persons, including physicians, who hold certain positions.  The statute expressly codifies a "duty to report," *id.*, not a standard of care as the dissent maintains.[11]  The duty applies to any of the covered persons "who reasonably believe[] that a minor is or has been the victim of physical injury, abuse, child abuse, a reportable offense or neglect that appears to have been inflicted on the minor by other than accidental means."  *Id.*  And contrary to our dissenting colleague's view, even assuming there were some evidence of a broader common law duty to report, the statute expressly provides that a physician's duty arises when a reasonable belief is developed "in the course of treating a patient."  *Id.*  The statute governs.  *See* § 1-201; *Garibay v. Johnson*, ___ Ariz. ___, ¶ 19, 565 P.3d 236, 242 (2025) (recognizing that "statutes may abrogate or limit the common law" and that "common law rules only apply when legislative guidance is lacking").  If this were not the case and some broader common law duty controlled, there would be no need for the statute.

¶44 The dissent's reliance on *Avitia* is misplaced.  As a preliminary matter, *Avitia* addressed both the common law and statute because both were raised in that case and the court concluded the statute did not apply.  256 Ariz. 198, ¶¶ 19, 25 .  It explained, "*[W]e need not resolve whether a duty ever arises* under § 13-3620(A) for a non-treating mental health professional to report harm to third parties because the statute's plain language clearly forecloses such a duty here."  *Id.* ¶ 22.  Quoting the statute, the court reasoned that it "creates a duty only when a person subject to the statute 'reasonably believes that a minor *is or has been* the victim' of injury, abuse, or neglect that 'appears to *have been* inflicted on the minor.'"  *Id.*  "That language is present and past tense, meaning that the belief pertains to existing or past circumstances, not speculation regarding the future."  *Id.*

---

[11]Although "headings to sections . . . do not constitute part of the law," A.R.S. § 1-212, "where an ambiguity exists the title may be used to aid in the interpretation of the statute," *State v. Barnett*, 142 Ariz. 592, 597 (1984).  The Does do not argue, nor do we think that § 13-3620 is ambiguous.  Nevertheless, the heading clearly describes, consistent with the statute itself, the existence of a duty and not a standard of care.  *See State v. Eagle*, 196 Ariz. 188, ¶ 7 (2000).

¶45          Then, in addressing the common law duty and public policy, *Avitia* overruled two cases: *Hamman v. County of Maricopa*, 161 Ariz. 58 (1989), which found the existence of a common law duty based on foreseeability, and *Little v. All Phoenix South Community Mental Health Center*, 186 Ariz. 97 (App. 1996), which held that A.R.S. § 36-517.02 "unconstitutionally abrogates the common law cause of action established in *Hamman*." Our supreme court expressly stated, "[B]ecause we overrule *Hamman*, *Little*'s conclusion that '§ 36-517.02 unconstitutionally abrogates the common law cause of action established in *Hamman*' is no longer viable." *Avitia*, 256 Ariz. 198, ¶ 38 (internal citation omitted).

¶46          The court noted that "Article 18, section 6 of the Arizona Constitution only protects common law rights in existence at the time the Constitution was adopted or that are based on those rights." *Id.* The court stated that *Hamman* "exercised the policy choice" to reject one standard as too narrow and to instead adopt one based on foreseeability. *Id.* ¶ 39. It further noted that "*Little* then erroneously divested the legislature of its constitutional authority to modify this judicially proclaimed public policy, and we therefore overrule it as well." *Id.*

¶47          The court pointed out that the parties "did not brief whether § 36-517.02 would be restored if this Court overturned *Little*." *Id.* ¶ 41. But it noted that the statute and common law liability were "consistent." *Id.* In this case, if the Does had argued the common law duty, to the extent one existed, and statutory duty were consistent, we would be left with the result reached by the majority because Dr. Herrod did not receive information about abuse or neglect "in the course of treating a patient." § 13-3620(A)(1); *see* § 12-561 (establishing duty in medical malpractice actions requires plaintiff to allege physician was negligent "in the rendering of health care"). However, in addressing the hypothetical situation in which a statute and common law are not consistent, the court in *Avitia* stated: "Beyond statutory duties, a common law duty may be found in parts of the Restatement, which we 'generally follow . . . unless it conflicts with Arizona law.'" 256 Ariz. 198, ¶ 43 (quoting *Quiroz*, 243 Ariz. 560, ¶ 41). Thus, the court indicated how any inconsistency between the statute and common law should be resolved. It is for the legislature to define public policy—so where the common law is inconsistent with a statute in regard to a special relationship created on the basis of such policy, the common law must give way. *See Seisinger*, 220 Ariz. 85, ¶¶ 27-28 & 28 ("[W]hen a substantive statute conflicts with the common law, the statute prevails under a separation of powers analysis."); *see also Zambrano v. M & RC II LLC*, 254 Ariz. 53, ¶ 43 (2022) (courts "exercise great restraint in declaring public

policy in the absence of legislative guidance" (quoting C*al-Am Props. Inc. v. Edais Eng'g Inc.*, 253 Ariz. 78, ¶ 17 (2022)).

¶48 I recognize our supreme court has held that "if the common law is to be changed or abrogated by statute, the legislature must do so expressly or by necessary implication." *Pleak v. Entrada Prop. Owners' Ass'n*, 207 Ariz. 418, ¶ 12 (2004). In this case, the Does have not argued a separate common law duty to report, so we are left to speculate about any discrepancy. But when a statute and common law define a duty differently, the "necessary implication" is that the legislature has chosen a public policy direction. And when faced with such an inconsistency, our obligation is to defer to the legislature's enactment since it is authorized to set public policy. *See Seisinger*, 220 Ariz. 85, ¶¶ 27-28. This is so even when the statute does not expressly state that it supersedes the common law. Indeed, § 36-517.02, discussed in *Avitia*, does not expressly state that it abrogates the common law. Yet our supreme court said, "*Little* then erroneously divested the legislature of its constitutional authority to modify this judicially proclaimed public policy, and we therefore overrule it as well." *Avitia*, 256 Ariz. 198, ¶ 39. The court also expressly cited § 1-201 which broadly and unequivocally states that "[t]he common law only so far as it is consistent with . . . and not inconsistent with . . . the laws of this state, is adopted." *Id.* ¶ 38. A showing of consistency or inconsistency with a statute is all that is required for the common law to stand or fall.

¶49 In sum, the court in *Avitia* evaluated duty under both the common law and statute because both were argued. I believe the dissent's position is not found in any statute and would essentially divest the legislature of its constitutional authority to both determine the duty to report child abuse and its scope.

E C K E R S T R O M, Presiding Judge, dissenting:

¶50 In negligence cases, Arizona courts determine whether a defendant owes a duty to a plaintiff by assessing the nature of the relationship between the parties. *See Quiroz*, 243 Ariz. 560, ¶ 14. Specifically, our supreme court has explained that a duty of care is based on "recognized common law special relationships or relationships created by public policy." *Id.*

¶51 In Arizona, it is settled, both by statute and under the common law, that healthcare providers owe a duty of care to their own patients. A.R.S. §§ 12-561 to 12-573 (acknowledging duty by setting forth comprehensive statutory scheme for litigation of medical malpractice

actions raised by patients against their healthcare providers); *see, e.g., Hafner v. Beck*, 185 Ariz. 389, 391 (App. 1996) (common law duty created by physician-patient relationship where physician provides treatment to patient); *Stanley*, 208 Ariz. 219, ¶¶ 10-11, 13 (implicitly acknowledging that "traditional doctor-patient relationship" would create duty); *see also* § 13-3620(A) (creating statutory obligation for physicians to report child abuse and therefore signaling special relationship created by public policy).

**¶52**          Here, the Does presented declarations and testimony that Dr. Herrod acted as their physician during the time frame of their abuse. Although disputed by Herrod, the superior court found, and the majority does not dispute, that these declarations created a genuine issue of material fact on that question. Because physicians owe a duty of care to their patients, recognized in both Arizona statute and common law, and the Does have proffered evidence showing that such a relationship existed, the superior court erred in granting summary judgment on the ground that the Does had failed to establish this element.[12]

---

[12]The majority asserts that the issue was not squarely raised by the Does on appeal. But, to the extent the Does waived the precise arguments that would have triggered the correct analysis of duty in this case, waiver is a prudential doctrine. *See City of Tucson v. Clear Channel Outdoor, Inc.*, 209 Ariz. 544, n.9 (2005). We should be reluctant to apply it when, as here, doing so would require us to reach a legally incorrect result and thereby mislead future trial courts and litigants encountering similar questions under § 13-3620(A).

And, although not the central thrust of their arguments on appeal, the Does have squarely challenged the propriety of the grant of summary judgment by arguing, in their opening brief, that common-law professional standards of care should prevail: "The Plaintiffs' expert, Dr. Berg, stated that, based on a clear medical and ethical standard of care, Dr. Herrod had a duty to report the abuse of the children and the neglect by their mother." Similarly, before the superior court, the Does challenged the Medical Defendants' motion for summary judgment by emphasizing, in the very first sentence of their opposition, that "Dr. John Herrod [had] treated Paul Adams . . . and the Adams children at Defendant Lenzner Medical Services," such that "Dr. Herrod and Lenzner owed Plaintiffs a duty of care."

Finally, the majority's contention that the Does have expressly eschewed analysis under traditional duty analysis takes the Does' argument out of

**¶53** The majority nonetheless affirms the superior court's judgment, asserting that the language of § 13-3620(A)(1) narrows the scope of a physician's traditional duty of care. Based on that statute, my colleagues specifically conclude that physicians owe no civil duty, in the context of child abuse, to marshal information acquired outside of the clinical setting in protecting their patient's health. But, to the extent § 13-3620(A), a criminal statute, pertains to a physician's civil liability in tort, I cannot agree that its terms address the question of duty.

**¶54** Our supreme court has pointedly stated, "The existence of a duty of care is a distinct issue from whether the standard of care has been met in a particular case." *Gipson*, 214 Ariz. 141, ¶ 10. In elaborating on that difference, that court has characterized the standard-of-care question as one determining "[w]hat the defendant must do or must not do . . . to satisfy the duty." *Perez*, ___ Ariz. ___, ¶ 18, 564 P.3d at 629 (quoting *Coburn v. City of Tucson*, 143 Ariz. 50, 52 (1984) (quoting with approval standard of care definition from W. Prosser & W. Keeton, *The Law of Torts* § 53, at 356 (5th ed. 1984))).

**¶55** To the extent Dr. Herrod acted as the Does' physician, he undertook a duty of care for their health. In calibrating the species of information requiring Herrod to report, § 13-3620(A) addresses what Herrod "must do or must not do" to satisfy the traditional relationship between physician and patient—a standard-of-care question as our courts have consistently defined it. *Perez*, ___ Ariz. ___, ¶ 18, 564 P.3d at 629. Thus, when contesting whether Herrod should have conveyed his knowledge of the Does' abuse to law enforcement, the parties dispute not whether Herrod had a threshold duty to protect the Does' health, but what that duty entails.

**¶56** Nor does the statute's criteria for a physician's criminal liability sound as a "scope" of duty question. *Id.* When resolving whether a particular injury falls within the scope of a special relationship, we must assess "whether the risk of harm" that is "alleged to have injured the plaintiff arose within that relationship." *Id.* ¶¶ 20-21. Under traditional

---

context. Instead, the Does merely seek to distinguish the analysis of duty under § 13-3620(A) from *Dinsmoor*, 251 Ariz. 370. Indeed, they proceed to argue that duty under that statute should be analyzed under *Gipson* and *Quiroz*—both cases which focus on assessing duty through the traditional lenses of special relationships arising from both the common law and statutes.

understandings of the physician-patient relationship, Dr. Herrod undertook to protect the Does from risks of harm to their health. The Does allege grievous injuries to their health that they assert Herrod could have prevented. And, assuming the facts in the light most favorable to the Does, those injuries could have been mitigated or prevented by Herrod during the time he treated them. Thus, both the nature of the injuries suffered, and the timing of when they occurred, fell squarely within the scope of Herrod's duty.

¶57 The physician-patient relationship also creates a presumption that physicians will marshal information in their possession, pertinent to a patient's health, to protect the patient from that risk of harm. *See, e.g.,* *Stanley*, 208 Ariz. 219, ¶ 13. (radiologist had affirmative duty to disclose x-ray information pertinent to patient's health even in absence of direct contractual relationship with patient).[13] Once Paul confessed to Dr. Herrod that he had been sexually abusing his eldest daughter, Herrod possessed information, pertinent to her health, that he failed to marshal to protect her health, as well as that of her siblings.[14] Thus, the very gravamen of the negligence claim here stands at the core of a physician's traditional duty to a patient.

¶58 The superior court also overlooked that § 13-3620 does not purport to limit the common law duty of physicians to care for their patient's health. That provision describes only what steps physicians "must do or must not do," in the context of child abuse, to avoid criminal penalties. *Perez*, ___ Ariz. ___, ¶ 18, 564 P.3d at 629. No text in § 13-3620 describes the underlying nature of the relationship between a physician and patient—the sole criteria for determining duty. To the contrary, the operative provisions

---

[13]The Does also assert a species of this argument in their opening brief, emphasizing that Dr. Herrod could not ignore information at his disposal in caring for his patients.

[14]In this case, the Medical Defendants assert that the application of the priest-penitent privilege should substantially limit the evidence that the Does can marshal to support their cause of action. How the superior court resolves the contours of that privilege should be the central question driving whether the Does have sufficient facts to present to a jury. But it is a separate question from whether the Does have established a threshold duty of care.

imply that physicians owe a threshold duty sufficiently robust to justify criminal sanctions for their dereliction.

¶59        But, even assuming that § 13-3620, a criminal statute, can be characterized as relevant to this civil action, it must be applied in the context of §§ 12-561 and 12-563.  These provisions articulate the civil standards for duty and standard of care pertaining to medical malpractice actions. Section 12-561 defines a cognizable medical malpractice action as one that asserts a physician has been negligent "in the rendering of health care" — a clause which defines a physician's duty of care broadly.  Under § 12-563, a healthcare provider breaches that duty by "fail[ing] to exercise that degree of care, skill and learning expected of a reasonable, prudent healthcare provider in the profession or class to which he belongs within the state acting in the same or similar circumstances."   § 12-563(1).[15]   Neither provision relieves physicians of civil liability when they fail to marshal crucial information at their disposal to prevent harm to their patients' health.[16]

¶60        Thus, § 13-3620(A) could only be construed as limiting a physician's scope of duty if its terms can be understood to qualify or override those civil statutes in the context of the reporting of child abuse. When we seek guidance from two statutes that address the same subject matter, we must harmonize them.  *UNUM Life Ins. Co. of Am. v. Craig*, 200

---

[15]To establish such a breach here, the Does have proffered both the expert opinion of a qualified physician, Dr. Richard Berg, and an ethical opinion from the AMA. Those opinions respectively assert and support that Dr. Herrod fell below his professional standard of care when he failed to consider information, secured outside the clinical setting, in caring for his patients.  Thus, to the extent Herrod acquired non-privileged information, outside of the clinical setting, that would alert a reasonable person that the Does were being abused, that proffer would create a genuine dispute as to whether Herrod fell below the standard of care as our legislature has defined it for medical malpractice actions.  *See* § 12-563(1).

[16]My colleagues construe the phrase "in the rendering of health care" as a narrow duty provision, addressing exclusively the interaction with a patient in a clinical setting.  § 12-561  But, our supreme court has implicitly held that a physicians duty — part of the "rendering of health care" — includes marshalling information, once acquired, to the patient's benefit, even when a physician has never met the patient.  *Stanley*, 208 Ariz. 219, ¶ 13.

Ariz. 327, ¶ 11 (2001). Here, we may readily do so by acknowledging the difference between statutes imposing criminal and civil liability. Generally, the former are reserved for discouraging and punishing more acute misconduct. *See State v. Far West Water & Sewer Inc.*, 224 Ariz. 173, ¶ 108 (App. 2010) (explaining legislature's general intent to articulate marked difference between criminal recklessness and civil negligence as basis for criminal prosecutions beyond civil liability); *Prosise v. Kottke*, 249 Ariz. 75, ¶ 25 (App. 2020) (addressing severity of conduct necessary to distinguish "between civil and criminal conduct"). For this reason, criminal statutes, to the extent pertinent to civil negligence cases, are generally understood as setting forth only minimum standards of conduct that, when violated, may constitute negligence per se. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 16 (2010) ("An actor's compliance with a pertinent statute . . . does not preclude a finding that the actor is negligent . . . for failing to adopt precautions in addition to those mandated by the statute."); *see also* Restatement (Second) of Torts § 288C cmt. a (1965) (applying same principle to criminal statutes as setting forth only minimum standard of care); *see, e.g.*, *Barret v. Lucky Seven Saloon, Inc.*, 96 P.3d 386, 393 (Wash. 2004) (criminal statutes may establish "minimum standards of conduct"); *Brannigan v. Raybuck*, 136 Ariz. 513, 517 (1983) (violation of criminal statutes may constitute negligence per se).

**¶61** The text of § 13-3620 supports such an application. Its language imposes criminal liability on those physicians who fail to report abuse evident "in the course of treat[ment]." *See* § 13-3620(A), (O). But no language therein relieves physicians of civil liability when they fail to report such information acquired outside of clinical settings. *AAA Cab Serv., Inc. v. Indus. Comm'n*, 213 Ariz. 342, ¶ 6 (App. 2006) ("This court cannot write a term into the statute that the legislature did not include."). And, far from expressly modifying the standards for civil liability articulated in § 12-561 and § 12-563, § 13-3620 does not refer to those statutes at all. This court should be reluctant to infer a limitation on a physician's civil duty to his patients—a limitation at odds with our civil statutes and common law—from a criminal statute that fails to expressly address those standards at all.[17]

---

[17]The concurring opinion correctly asserts that the scope of common law duty may be readily narrowed by statute—even when such statutes do not expressly articulate an intent to do so. *See Avitia,* 256 Ariz. 198, ¶ 39 (holding that § 36-517.02 overrides common law). But we do not address

¶62 Further, the majority reasoning implies that the same statute that *expressly extends* criminal liability to a physician who fails to report child abuse evident in the course of treatment—may be read to *impliedly limit* a physician's civil liability for a species of the same conduct. In so doing, the majority's holding defies the statute's purpose: to broadly protect children by motivating caregivers to report abuse to law enforcement. *See L.A.R.*, 170 Ariz. 24, 27 (finding § 13-3620(A) evinces a public policy of "encouraging people to report child abuse"). The majority's holding instead reduces the circumstances under which a physician must act to protect children and it shields physicians from even civil liability when they arguably violate their own profession's standards for reporting such abuse. While I am skeptical the legislature would have intended such a result, I am certain the plain language of the statute does not justify it.

¶63 Lastly, the majority asserts that the reported cases addressing § 13-3620 "all treat the obligation to report as a duty and not as a standard of care." But, of the cases it cites for that proposition, only *Avitia* addresses any duty question under § 13-3620(A).[18] 256 Ariz. 198, ¶¶ 16-24. That case does not resolve whether the statute's language—confining criminal liability for physicians to information acquired "in the course of treat[ment]"—conjures a "scope of a special relationship" or a standard-of-care question. *Id.* ¶ 21 (declining to reach question of whether statute "pertains" to defendant under "course of treat[ment]" clause); *Perez*, ___ Ariz. ___, ¶ 20, 564 P.3d at 630. To be sure, the court freely uses the word "duty" synonymously with "obligation" in determining the applicability of the statute to defendants. *Avitia*, 256 Ariz. 198, ¶ 24 ("Section 13-3620(A) imposes important duties to report abuse and neglect of children . . . ."). But, it never clarifies or addresses whether those

that presentation here. The civil duty of physicians to patients is found not only in our settled common law, but also in our civil statutes enacted by the legislature itself. *See* §§ 12-561, 12-563 (codifying physicians' scope of civil liability for negligence actions).

[18]*Zeitner*, 246 Ariz. 161, ¶ 21, and *Johnson*, 235 Ariz. 85, ¶ 29, address § 13-3620 only insofar as they discuss exceptions to privilege. In *Ramsey*, 225 Ariz. 132, ¶ 12, this court considered whether a mental health counselor owed a duty of care to a third-party alleged sexual abuser. But it addressed that question exclusively under the common law and never referenced the text of § 13-3620 in doing so. *Id.* ¶¶ 17-28, 31-37 (addressing § 13-3620 only in the context of immunity).

obligations should be characterized as defining the scope of any special relationship as distinguished from describing standards of conduct. *Id.* ¶ 22 (flagging, but not resolving, authentic special relationship question of whether, under statute, "non-treating mental health professional" has duty to report harm to third parties). Notably, after determining that the mental-health provider triggered no potential civil liability under the statute, the court proceeded to address whether that provider possessed a common law duty to a third party to report abuse. In so doing, the court implicitly acknowledged that § 13-3620, a criminal statute, would not set the lone standard for either duty or care for a civil case.

**¶64** For the above reasons, I would conclude that § 13-3620(A) establishes, at most, a minimum standard for physicians in reporting child abuse to law enforcement. To the extent it does so, the statute describes a minimum standard of care—rather than any limitation on a physician's threshold duty to care for their patient's health. In finding otherwise, and in rendering judgment against the Does on that basis, I would conclude the superior court erred.